[No. 56809–0. En Banc. December 6, 1990.]

THE STATE OF WASHINGTON, *Respondent,* v. STEPHEN C.
WHELCHEL, *Petitioner.*

*C.E. Hormel* and *J. Luke McKean,* for petitioner.

*Paul Klasen, Prosecuting Attorney,* and *Jerald R. Hamley, Deputy,* for respondent.

*Robert Goldsmith* on behalf of Washington Defender Association, amicus curiae for petitioner.

*Seth R. Dawson, Prosecuting Attorney for Snohomish County,* and *Seth Aaron Fine, Deputy,* amici curiae for respondent.

ANDERSEN, J.—

## FACTS OF CASE

At issue in this case is whether the first degree murder conviction of the defendant, Stephen C. Whelchel, should be reversed because the trial court admitted into evidence tape–recorded statements made by two codefendants who refused to testify at his trial. We affirm the defendant's conviction, but on a different basis than did the Court of Appeals in its unpublished opinion in this case.[1]

On October 15, 1986, one Robert Niverson told the Grant County Sheriff that a body was buried by Moses Lake. Officers discovered the body of Emargo McKee later that day. She had been stabbed and beaten. After a friend told Emargo's husband, Jerry McKee, that her body had been found, McKee went to the Moses Lake Police Department to file a missing persons report. When confronted with evidence of Emargo's murder, McKee admitted having been at the murder scene along with Jeffrey Flota, the defendant Stephen Whelchel, and two female juveniles, hereafter referred to as Nancy and Beth. McKee denied actually taking part in his wife's murder, however.

All five of these individuals were arrested on October 16. After the defendant's and Flota's arrest, a search of the car they were driving turned up a knife along with Emargo's purse in a box of clothing on the backseat. Following their arrests, all except the defendant Whelchel gave statements

---

[1]*State v. Whelchel,* 55 Wn. App. 1043 (1989).

to the police describing Emargo's murder. McKee's statements of October 16 and 17 were tape recorded, as was Flota's October 16 statement.

The following description of Emargo's murder is derived primarily from Nancy's and Beth's testimony at the defendant's trial.

On Wednesday, September 24, 1986, 16–year–old Nancy was staying at Beth's house. Late that night, the defendant Whelchel came over and took them to the McKee apartment. The McKees had been married 6 months. The young women were planning to go to California with the McKees, the defendant, and Jeff Flota. Beth was the defendant's girl friend; Nancy was Flota's girl friend. The four of them stayed with the McKees in their 1–room apartment until September 26. That night Nancy and the defendant argued with Emargo; then the McKees left the apartment for an hour or so. Upon their return, McKee came up to the apartment alone. At that time, the defendant either asked or told him "tonight's the night". Emargo came up to the apartment later, after apologizing to the defendant.

At the defendant's suggestion, the group walked down to Moses Lake at about 3 a.m. Flota and the defendant each carried a taped, reinforced table leg. The legs had been used during an unrelated earlier incident at Flota's home. The defendant also wore what Beth described as a hunting knife. Flota, McKee and the defendant separated from the others and played a game of "rock, scissors and paper" to see who would kill Emargo. Flota "won" the game but said he couldn't bring himself to kill her.

The defendant had everyone form a circle and hold hands. He then broke the circle, saying he had to go to the bathroom. As the defendant passed behind Emargo, he struck her on the head with the table leg, knocking her to the ground. Nancy ran away, and McKee followed her. Beth testified that before McKee left, the defendant handed him the knife, but McKee gave it back, saying he couldn't do it. The defendant continued to beat Emargo. Flota attempted to leave, but the defendant called him

back and insisted that he put Emargo in a "sleeper hold". Flota came back and held Emargo for about 5 minutes. The defendant then stabbed Emargo at least twice, and Beth beat her with the table leg. After Flota and the defendant dropped Emargo's body into some bushes, the five returned to the McKee apartment. McKee and the defendant dumped the table legs in the countryside the next day, and a few days later McKee and Flota returned to the murder site to bury Emargo's body.

The Grant County Prosecuting Attorney charged all five suspects with first degree murder. Nancy pleaded guilty in juvenile court to rendering criminal assistance and agreed to testify against McKee, Flota, and the defendant (all of whom were adults). Beth, also a juvenile, pleaded guilty to first degree murder in exchange for the prosecuting attorney's promise not to prosecute her as an adult; she also agreed to testify against the three male codefendants.

The defendant's trial was severed from that of McKee and Flota. A jury found both McKee and Flota guilty of first degree murder on January 31, 1987. Following their convictions, the trial court granted defendant's motion for a change of venue. His trial was held in King County, with a judge of the Superior Court from Grant County presiding.

Prior to trial, the defendant moved to exclude the tape–recorded statements made by McKee and Flota. (Both McKee and Flota claimed their constitutional privilege against self–incrimination and refused to testify against the defendant.) The trial court denied the motion to exclude, finding McKee and Flota unavailable to testify and concluding that their statements were admissible as statements against penal interest under Evidence Rule 804(b)(3) and not violative of the defendant's confrontation clause rights.

At trial, Nancy and Beth testified according to the facts outlined above. The jury also heard McKee's and Flota's tape–recorded statements which were basically to the same effect as the testimony of the two eyewitnesses. The State also called a number of witnesses who testified that the defendant had admitted murdering Emargo. Witness

Turina Liebrecht testified that when the defendant and McKee came to her home in late September, the defendant said "we killed" Emargo. Her sister, Audrey McClelland, testified that the defendant also told her "we killed" Emargo. Witness Steve Kirkendoll, a friend of the defendant's, testified that the defendant told him before Emargo's death that he wanted her killed because she was a nag. Witness Douglas Crozier testified that he and the defendant attended a party on October 11 during which the defendant "told me that he had killed somebody and that he would do it again for a friend and asked me if I was a friend." Witness Tracy Weaver testified that the defendant told him at the same party that "him and his friends killed Jerry's wife." Witness Mary Mosley was at the Moses Lake alternative high school in September 1986 where, according to her testimony, she heard the defendant say to Flota, "we're going to kill her." Witness David Joy, who was incarcerated in the county jail with the defendant before the latter's trial, testified that the defendant admitted killing Emargo McKee by clubbing her head.

The defendant also testified at the trial. He admitted that he was at the McKee apartment with the others but said he left to go home at about 1:30 a.m. on September 27. He testified that it was not until the next day that he learned about Emargo's murder from McKee. According to the defendant's testimony, McKee told him that Beth repeatedly hit Emargo, and that Flota put a choke hold on her and she went limp. He testified that McKee then told the defendant that he had stabbed Emargo. The defendant further testified that he then decided to help his friends get rid of the evidence, and agreed to wash Beth's and McKee's bloody clothing at his house. He said that he and McKee also drove out into the country where they threw the table legs away.

Members of the defendant's family testified as alibi witnesses for him. His mother testified that early in the morning of the 27th, she awakened to find the defendant at home watching television. When she got up at 6 a.m., she

said, he was asleep in her living room and slept until late morning. Defendant's sister testified that she heard her mother and brother talking early in the morning of the 27th. Defendant's father also testified that his son was at home early on the 27th and slept until almost noon. When asked why they didn't give the authorities this information until a month before trial, defendant's mother said, "No one came to me", and his father added that "we felt that it was best to keep quiet until he had counsel and went through it."

The State presented the testimony of Beth's mother and a Grant County deputy sheriff to rebut the defendant's alibi. These witnesses testified that, in response to a runaway complaint filed by Beth's mother, they went separately to the defendant's home on September 27 at around noon. Both stated that they talked to the defendant's parents and did not find the defendant at home. The defendant's father told the deputy sheriff and Beth's mother that his son did not live there. At 2:10 p.m. that afternoon, the deputy sheriff stopped the McKee car and found McKee and the defendant inside. The dispatch supervisor for Grant County 911 confirmed the deputy's testimony with dispatch records.

The jury found the defendant guilty of first degree murder. The defendant appealed, and in an unpublished opinion the Court of Appeals affirmed his conviction. The defendant then sought discretionary review in this court on several issues. We granted review on the following single issue.

## ISSUE

Did the trial court err by admitting into evidence the tape–recorded statements of two codefendants who refused to testify at the defendant's trial?

## DECISION

CONCLUSION. The trial court's admission of the tape–recorded statements was error because, contrary to its view

(and that of the Court of Appeals in its unpublished opinion affirming the trial court), the codefendants' hearsay statements were not against penal interest and thus not admissible in evidence at the defendant's trial under ER 804(b)(3), nor did they bear the "adequate indicia of reliability" needed to satisfy confrontation clause concerns. We further conclude, however, that the trial court's error was harmless because of the overwhelming untainted evidence of the defendant's guilt presented at the trial.

■■ The defendant argues that the tape–recorded statements of his codefendants Flota and McKee were not admissible under ER 804(b)(3) or the confrontation clause of the Sixth Amendment. The federal confrontation clause gives a defendant the right to "be confronted with the witnesses against him".[2] This constitutional provision renders hearsay implicating an accused admissible in a criminal trial only if the declarant is unavailable and the statement bears adequate indicia of reliability or particularized guaranties of trustworthiness.[3] The inquiry into trustworthiness ensures that the proffered evidence offers some reliability in terms of the declarant's perception, memory, and credibility—a function traditionally performed by cross examination.[4] Reliability is presumed if the evidence falls within a firmly rooted hearsay exception. Otherwise, the evidence must be excluded absent a showing of trustworthiness.[5] The exception for declarations against penal interest under ER 804(b)(3) is not generally regarded as firmly rooted.[6]

■ ER 804(b)(3) provides that hearsay statements against penal interest are admissible if (1) the declarant is

---

[2]U.S. Const. amend. 6.

[3]*State v. Parris*, 98 Wn.2d 140, 145, 654 P.2d 77 (1982); *State v. Edmondson*, 43 Wn. App. 443, 448, 717 P.2d 784, *review denied*, 106 Wn.2d 1016 (1986).

[4]*State v. Anderson*, 107 Wn.2d 745, 750–51, 733 P.2d 517 (1987).

[5]*Parris*, 98 Wn.2d at 145; *Edmondson*, 43 Wn. App. at 448.

[6]*Parris*, 98 Wn.2d at 148; *Edmondson*, 43 Wn. App. at 448.

unavailable to testify, (2) the statements so far tend to expose the declarant to criminal liability that a reasonable person in the same position would not have made the statement unless convinced of its truth, and (3) corroborating circumstances clearly indicate the statement's trustworthiness.[7] The rule itself expressly requires corroboration only of statements *exculpating* the accused.[8] Case law, however, has imposed this requirement for *inculpatory* statements as well.[9] (An inculpatory statement is one that implicates both the declarant and the defendant in criminal activity and is admitted against the defendant.)[10] This judicially imposed requirement is aimed at satisfying confrontation clause concerns.[11] As one commentary explains:

> An inculpatory statement . . . is directed against the defendant, and the sixth amendment arguably is violated if the defendant cannot confront the declarant. Consequently, inculpatory statements must be scrutinized intensively to see if they conform to sound hearsay doctrine and confrontation clause requirements.

(Footnote omitted.) Beaver & McCleary, *Inculpatory Statements Against Penal Interest:* State v. Parris *Goes Too Far,* 8 U. Puget Sound L. Rev. 25, 28 (1984).

Thus, the corroboration requirement for admitting inculpatory statements under ER 804(b)(3) arguably mirrors the trustworthiness requirements for such hearsay under the confrontation clause.[12] If admissible under ER 804(b)(3),

---

[7]*State v. St. Pierre,* 111 Wn.2d 105, 117, 759 P.2d 383 (1988); *Edmondson,* 43 Wn. App. at 447.

[8]ER 804(b)(3); *Edmondson,* 43 Wn. App. at 447.

[9]*Edmondson,* 43 Wn. App. at 447; *Parris,* 98 Wn.2d at 148.

[10]*United States v. Riley,* 657 F.2d 1377, 1381 n.5 (8th Cir. 1981), *cert. denied,* 459 U.S. 1111 (1983).

[11]*United States v. Sarmiento–Perez,* 633 F.2d 1092, 1098 (5th Cir. 1981); *United States v. Vernor,* 902 F.2d 1182, 1187 n.3 (5th Cir. 1990).

[12]*See Vernor,* 902 F.2d at 1187 n.3; *United States v. Garcia,* 897 F.2d 1413, 1421 (7th Cir. 1990).

the tape–recorded statements of McKee and Flota should satisfy confrontation clause requirements as well.

The first requirement for admissibility under ER 804(b)(3) is that the declarants are unavailable to testify. Both Flota and McKee refused to testify against the defendant, citing their Fifth Amendment right against self–incrimination. They were properly found unavailable to testify.[13] The next requirement under ER 804(b)(3) is that the statements must be against the declarant's penal interest. Inculpatory statements of a codefendant have traditionally been viewed with special suspicion.[14] ". . . Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.'"[15] The notes that accompany Fed. R. Evid. 804(b)(3) recognize that such statements might not truly be against penal interest:

> [A] statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest.

Fed. R. Evid. 804(b)(3) advisory committee note exception (3).

The Fifth Circuit cited this note in finding a codefendant's inculpatory confession inadmissible as a statement against penal interest in *United States v. Sarmiento–Perez,* 633 F.2d 1092, 1095 (5th Cir. 1981), *cert. denied,* 459 U.S. 834 (1982). In *Sarmiento–Perez,* the declarant's in-custody confession regarding cocaine distributing strongly implicated codefendant Sarmiento–Perez as well. The court

---

[13]*See State v. Dictado,* 102 Wn.2d 277, 287, 687 P.2d 172 (1984); *State v. Solomon,* 5 Wn. App. 412, 416–17, 487 P.2d 643, *review denied,* 80 Wn.2d 1001 (1971).

[14]*Sarmiento–Perez,* 633 F.2d at 1094 (citing *Bruton v. United States,* 391 U.S. 123, 141–42, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968)).

[15]*Lee v. Illinois,* 476 U.S. 530, 541, 90 L. Ed. 2d 514, 106 S. Ct. 2056 (1986) (citing *Bruton,* at 141).

stated that while the declarant's statement was an explicit confession of criminal activity on his part, its inquiry could not end there. Close examination of all the circumstances surrounding the making of the statement was required to determine whether it so contravened the declarant's penal interest that a reasonable person in his position would not have made the statement accusing a third person unless he believed it true.[16] Such examination revealed circumstances that cast doubt on whether the declarant's statement was truly disserving.

> This was not a spontaneous declaration made to friends and confederates, but a custodial confession, given under potentially coercive circumstances that could not at trial—and cannot now—be adequately examined. There were, in addition, obvious motives for falsification—the very natural desire to curry favor from the arresting officers, the desire to alleviate culpability by implicating others, the enmity often generated in a conspiracy gone awry, the desire for revenge, all might lead an arrestee–declarant to misrepresent or to exaggerate the role of others in the criminal enterprise.

(Citations omitted.) *Sarmiento–Perez,* 633 F.2d at 1102. After also observing that the declarant was allowed to plead guilty to all but one of the five counts upon which he was indicted, the court found it reasonable to suppose that the declarant might well have viewed the statement as a whole to be *in* his interest rather than *against* it.[17]

The Eighth Circuit cited *Sarmiento–Perez* in declining to find a codefendant's inculpatory statement adverse to her penal interest in *United States v. Riley,* 657 F.2d 1377, 1384 (8th Cir. 1981), *cert. denied,* 459 U.S. 1111 (1983). At issue in *Riley* was the admissibility of a statement in which the declarant, a minor, admitted engaging in prostitution after the defendant drove her across state lines, thus subjecting him to prosecution under the Mann Act.[18] The

---

[16]*Sarmiento–Perez,* 633 F.2d at 1102.

[17]*Sarmiento–Perez,* 633 F.2d at 1102.

[18]*Riley,* 657 F.2d at 1380.

court again observed that while the declarant clearly implicated herself in criminal conduct, further scrutiny was necessary to determine whether her statements were truly against her penal interest because they inculpated a third party.[19]

In *Riley,* the declarant's statement was made while she was in custody and in response to police questioning, although she was not formally charged at that time and thus not engaged in plea bargaining.[20] There was no indication that any promises or threats had been made to induce her to make the statement.[21] The declarant admitted working as a prostitute, however, and was told that a prostitution conviction could jeopardize the custody of her child.

> Thus . . . [the declarant] may well have believed that it was in her best interest to make a statement implicating appellant in order to ingratiate herself with the authorities and divert attention to another. Moreover, prostitution, the crime to which [the declarant] confessed, is much less serious than violation of the Mann Act, the crime in which she has implicated appellant. In addition, [the declarant's] unedited statement suggests that, despite her relationship with appellant, she was physically afraid of appellant . . . and wanted to leave him and thus may have been motivated to misrepresent the circumstances, the parties' relationship, and in particular appellant's role in the events in question.

(Citations omitted.) *Riley,* 657 F.2d at 1384.

Consistent with these holdings, at least one commentator urges the exclusion of inculpatory statements, made in custody or not, that assign a minor criminal role to the declarant and a major role to the accused.

> A statement conceding a minor role to declarant and attributing to another the major responsibility resembles more an attempt to foist blame on the other while minimizing declarant's responsibility, and thus the statement as a whole

---

[19]*Riley,* 657 F.2d at 1384.

[20]*Riley,* 657 F.2d at 1384.

[21]*Riley,* 657 F.2d at 1384.

advances far more than it impairs the interests of the declarant, hence lying outside the instant exception [Fed. R. Evid. 804(b)(3)] if offered as proof of the other's conduct.

4 D. Louisell & C. Mueller, *Federal Evidence* § 489, at 1141 (1980).

In the case at bar, the State offered the tape–recorded statements of codefendants McKee and Flota as evidence of the defendant's conduct. All of the statements were made in custody and in response to questioning after *Miranda* rights had been given and waived. In each statement the officers were careful to establish that neither suspect had been threatened with or promised anything. Thus, plea bargaining is not at issue. Indeed, at one point, the officers informed McKee that he was an accessory to the crime, and "you're in just as much trouble as anybody else." They added, however, that "the only thing that can help is the total truth of this matter."

Both McKee and Flota admitted knowing that the defendant wanted to kill Emargo when they all went down to the lake together, and both admitted that they did nothing to try and save her life. In McKee's initial statement, however, he stated that he left the murder scene as soon as the first blow was struck. "I didn't, I didn't do, I didn't even take part of doing anything to her. Steve and Jeff did it all." After the police learned from Flota that the three men had played a game to see who would kill Emargo, McKee admitted playing "rock, scissors and paper". He continued to insist, however, that he had never struck or stabbed Emargo. Flota also ascribed most of the fault for the murder to the defendant, saying that Emargo was still alive after he put her in the sleeper hold (which he claimed the defendant made him perform), and was stabbed to death by the defendant. McKee and Flota also stated that the defendant would have harmed them if they had interfered with the murder. Both professed some fear and dislike of the defendant and McKee added that the defendant had threatened to come after him if he said anything implicating the defendant in the murder.

■ Here, as in *Riley* and *Sarmiento–Perez,* while the declarants' statements are somewhat disserving, the overall circumstances make them self-serving. When the police talked to McKee and Flota, they knew that the two were involved in Emargo's murder. (Officers had spoken to Nancy before they took McKee's first statement.) The two men had obvious motives for falsification, and for putting their own actions in the best light possible. The enmity and desire for revenge displayed in *Sarmiento–Perez,* as well as the fear mentioned in *Riley,* may well have prompted McKee and Flota to exaggerate the defendant's guilt and minimize their own.

Indeed, the McKee and Flota statements are similar to a codefendant's statement that we held did *not* qualify as a declaration against penal interest in *State v. St. Pierre,* 111 Wn.2d 105, 117, 759 P.2d 383 (1988). In *St. Pierre,* one Andrew Webb told police that he was present when codefendant Paul St. Pierre shot John Achord. Webb said that the shot did not kill Achord, and that he suggested that they call an ambulance to try to save him. Instead, according to Webb, Paul St. Pierre stabbed Achord to death.[22] We did not find Webb's statements admissible under ER 804(b)(3).

> Contrary to the State's argument that Webb was exposing himself to great criminal liability when he gave his statement to police, the facts of this case suggest just the opposite. Rather than exposing himself to greater criminal liability, Webb was seeking to diminish that liability by showing that he alone tried to help Achord . . .

*St. Pierre,* 111 Wn.2d at 117–18.

Here, as in *St. Pierre,* the declarants admitted witnessing a murder, but minimized their responsibility for it as much as they could under the circumstances. In so doing, they may well have been trying to curry favor with the police or acting under the misapprehension that their statements

---

[22]*State v. St. Pierre,* 111 Wn.2d 105, 107–08, 759 P.2d 383 (1988).

might somehow save them from being prosecuted for murder.[23]

We thus conclude that the McKee and Flota statements do not satisfy the against penal interest requirement of ER 804(b)(3). Moreover, these statements also lack the adequate "indicia of reliability" required for admissibility under both ER 804(b)(3) and the confrontation clause.

The courts in this state apply a 9–point set of guidelines to determine whether the reliability required of inculpatory statements under ER 804(b)(3) and the confrontation clause is satisfied.[24]

The first guideline is whether the declarant had an apparent motive to lie. As the discussion of the against penal interest requirement reveals, both declarants had a motive to lie.

The second guideline is whether the general character of the declarant suggests trustworthiness. McKee's character suggests just the opposite, since he initially went to the police in an attempt to mislead them by filing a missing persons report. Moreover, the fact that both declarants made their statements in the face of certain criminal prosecution indicates that they at least had cause to be less than trustworthy when they implicated the defendant.[25]

The third guideline, whether more than one person heard the statements, is irrelevant in this case since the statements at issue were taped.

---

[23]See Nock, *Twist and Shout and Truth Will Out: An Argument for the Adoption of a "Safety Valve" Exception to the Washington Hearsay Rule,* 12 U. Puget Sound L. Rev. 1, 16–17 (1988).

[24]See *State v. Anderson,* 107 Wn.2d 745, 750, 733 P.2d 517 (1987); *State v. Edmondson,* 43 Wn. App. 443, 449, 717 P.2d 784, *review denied,* 106 Wn.2d 1016 (1986); *State v. Gee,* 52 Wn. App. 357, 362–63, 760 P.2d 361 (1988), *review denied,* 111 Wn.2d 1031 (1989); *State v. Rivas,* 49 Wn. App. 677, 687, 746 P.2d 312 (1987).

[25]See *Anderson,* 107 Wn.2d at 752–53 (no reason to doubt trustworthiness when declarant made statements to close friend before police suspicions aroused).

The fourth guideline is whether the statements were made spontaneously. All of the tape–recorded statements consist of detailed, specific questions and specific answers; none involves any kind of unsolicited narrative on the part of the declarant. The officers clearly were looking for specific information when they questioned McKee and Flota. This scenario does not tend to lend itself to a finding of spontaneity, and is in marked contrast to one declarant's voluntary (and thus spontaneous) statements to a friend,[26] and to another's statements made to an undercover police informant during a drug purchase.[27]

The fifth reliability guideline concerns whether the timing of the statements and the relationship between declarant and witness suggest trustworthiness. In assessing this point, Washington courts have found statements made to friends more reliable than those made to police officers.[28] In one case, however, the Court of Appeals found inculpatory statements made to police reliable because of their timing.

> Although a statement made by the declarant to a friendly witness would certainly appear more reliable than a statement to an officer at the time of arrest, we find sufficient reliability exists because Ernie's statements were made so soon after the actual event and clearly without any attempt to fabricate a response.

*State v. Rivas*, 49 Wn. App. 677, 688, 746 P.2d 312 (1987). In this case, the tape–recorded statements in question were made 3 weeks after the murder occurred. Toward the end of that time, the defendant had grown angry and threatened to turn the other four in. Thus, McKee and Flota had both opportunity and motive to reassess the events surrounding the murder. Neither the timing of their statements nor the relationship between the declarants and the

---

[26]*See Anderson,* 107 Wn.2d at 752–53.

[27]*State v. Parris,* 98 Wn.2d 140, 152, 654 P.2d 77 (1982).

[28]*See Anderson,* 107 Wn.2d at 752; *State v. Edmondson,* 43 Wn. App. at 450.

questioning officers conveys any particular assurances of trustworthiness.

The sixth guideline is whether the statements contained express assertions of past fact. Such assertions were the essence of the tape–recorded statements. This is contrary to the situation in *Rivas,* for example, where the Court of Appeals found it "clear that Ernie's statements were not assertions of past fact, such that he would have time to fabricate responses."[29] Rather, the many assertions of past fact indicated that the statements "did not carry on their face a warning against giving them undue weight".[30]

Guideline seven is whether cross examination could not help to show the declarant's lack of knowledge. This is not a case where the declarants were incompetent to testify and so could not have answered questions on cross examination, as is often the case, for example, when the declarants are children.[31] The declarants here clearly were able to respond to close questioning, as the tapes demonstrate. It is true, as the State maintains, that the jury heard McKee and Flota answer the questions and could assess the credibility of their responses for themselves. It is also at least possible, however, that cross examination might have served to show the declarants' lack of knowledge concerning some details of the murder.

The eighth guideline is whether the possibility of the declarant's recollection being faulty is remote. In *Rivas,* the Court of Appeals found no possibility for faulty recollection, given the fact that the boy implicated his brother as both fled the scene of the crime.[32] Here, however, the statements were made almost 3 weeks after the murder

---

[29]*Rivas,* 49 Wn. App. at 687–88.

[30]*Edmondson,* 43 Wn. App. at 450.

[31]*See State v. Swan,* 114 Wn.2d 613, 651, 790 P.2d 610 (1990); *State v. Gitchel,* 41 Wn. App. 820, 828, 706 P.2d 1091, *review denied,* 105 Wn.2d 1003 (1985).

[32]*Rivas,* 49 Wn. App. at 688.

occurred. McKee himself stated that it had been so long ago he had trouble remembering some of the more minor details. The time period also gave McKee and Flota the opportunity to compare notes. We cannot say with any degree of certainty that the possibility for faulty recollection is remote in this case.

The ninth and final guideline to consider in assessing reliability is whether the circumstances surrounding the statements give no reason to suppose that the declarant misrepresented the defendant's involvement. This is similar to the first guideline, whether the declarant had a motive to lie. Our foregoing discussion demonstrates reason to suppose that declarants *could* have misrepresented both their own and the defendant's role.

Thus, it is clear to us that the nine guidelines discussed above do not support a finding that the tape–recorded statements were sufficiently trustworthy to satisfy either ER 804(b)(3) or the confrontation clause.

The State argues that other evidence of guilt may be used to establish reliability; we disagree. As declared in *State v. Ryan,* 103 Wn.2d 165, 174, 691 P.2d 197 (1984),[33]

> Adequate indicia of reliability must be found in reference to circumstances surrounding the making of the out–of–court statement, and not from subsequent corroboration of the criminal act. "The circumstantial guarantees of trustworthiness on which the various specific exceptions to the hearsay rule are based are those that existed at the time the statement was made and do not include those that may be added by using hindsight." *Huff v. White Motor Corp.,* 609 F.2d 286, 292 (7th Cir. 1979).

The United States Supreme Court recently agreed with this statement in *Idaho v. Wright,* __ U.S. __, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990). The Court there held that only the circumstances surrounding the making of hearsay statements may be used to establish the reliability of such statements for confrontation clause purposes.[34]

---

[33]*See also Anderson,* 107 Wn.2d at 751; *Edmondson,* 43 Wn. App. at 452–53.

[34]*Idaho v. Wright,* __ U.S. __, 111 L. Ed. 2d 638, 655, 110 S. Ct. 3139 (1990).

Thus, we conclude that collateral evidence of guilt is unavailable to establish the reliability that we find absent in this case.

The Court in *Wright* raised at least some question of the strength of its previous holding that the indicia of reliability required of inculpatory hearsay under the federal constitution's confrontation clause may flow from either the circumstances surrounding a declarant's confession or the "interlocking" nature of the declarant's and the codefendant's confessions.[35] It is unnecessary to here consider the merits of the "interlocking confession" holding, however, since we do not see, despite the State's arguments, how the defendant's single–sentence admissions sufficiently interlock with the declarants' detailed statements so as to render the latter reliable. Nor do we perceive how Nancy's and Beth's testimony may be regarded as the interlocking confession that makes the declarants' statements reliable for confrontation clause purposes.

The defendant argues that a holding of unreliability is required under article 1, section 22 (amend. 10) of our state constitution, which guarantees an accused the right "to meet the witnesses against him face to face". The Washington Defender Association, writing as amicus curiae, urges us to go one step further and find inculpatory statements against penal interest made in custody categorically inadmissible under the state constitution. Both make their arguments in light of the factors set forth in *State v. Gunwall*, 106 Wn.2d 54, 61–62, 720 P.2d 808, 76 A.L.R.4th 517 (1986). We are not persuaded, however, that we must depend on the state constitution to exclude the tape–recorded statements in this case, and we do not consider categorical exclusion to be appropriate.

The State contends that any error in admitting the tape–recorded statements was invited. The State did not refer to the tape–recorded statements in its opening statement at

---

[35]*See Wright*, 111 L. Ed. 2d at 658 (discussing *Lee v. Illinois*, 476 U.S. 530, 546, 90 L. Ed. 2d 514, 106 S. Ct. 2056 (1986)).

trial, but the defense referred to them several times during its opening statement. The State maintains that it had decided not to use the McKee and Flota statements until the defense referred to them in opening argument, whereupon the State had to admit them or have the jury conclude that it was withholding material evidence. The State also argues that any error in this regard was invited by the defense since the tape recordings provided the key to the defense strategy at trial; without the tape recordings, maintains the State, the defense could not have argued as it did that the four other suspects all conspired to "railroad" the defendant.

It is well settled that any party may, in opening statement, refer to admissible evidence expected to be presented at trial.[36] More specifically, defense opening statements will generally cover what the defense expects to be able to prove, an outline of the expected weaknesses in the State's anticipated proof, or may simply remind the jurors to reserve judgment until all the evidence is in.[37] Defense counsel may also use the opening statement to emphasize the concept of reasonable doubt. This means, in part, telling the jury the ways that defense counsel claims that he or she will be able to demonstrate uncertainties in the State's case.[38]

Defense counsel's opening references to the tape-recorded statements focused on their internal contradictions and on how they would conflict with other testimony that the State was expected to present. It is arguable that defense counsel would have been remiss to ignore the McKee and Flota statements since the State argued vigorously (and successfully) at a pretrial hearing for their admission and evidently gave no indication that it did not

---

[36]*State v. Piche*, 71 Wn.2d 583, 585, 430 P.2d 522 (1967), *cert. denied*, 390 U.S. 912 (1968); *State v. Gellerman*, 42 Wn.2d 742, 747–49, 259 P.2d 371 (1953).

[37]13 R. Ferguson, *Wash. Prac.* § 3701, at 343 (1984).

[38]13 R. Ferguson, § 3707, at 347–48.

plan to use them. Furthermore, while the tape recordings certainly bolstered the defendant's conspiracy theory, that theory could have been supported by Nancy's and Beth's testimony alone. The defense both defused and used the incriminating evidence as best it could, and we do not regard those efforts as constituting invited error.

■ The State argues finally that if admission of the tape–recorded statements was error, it was harmless error in light of the overwhelming evidence of the defendant's guilt; we agree.[39] A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result without the error.[40] Constitutional error is presumed to be prejudicial and the State bears the burden of proving that the error was harmless.[41] In the case before us, the untainted evidence of the defendant's guilt consists mainly of Nancy's and Beth's testimony at trial and of the testimony of numerous of the defendant's friends and acquaintances detailing his voluntary confessions and admissions to them.

The trial testimony of Nancy and Beth, the two eyewitnesses to the killing, clearly established the defendant as the murderer. These two young women testified to essentially the same series of events. Both described the defendant's intent to kill Emargo on the 27th, the group's trip to the lake and the circle made at his suggestion, and the defendant's acts of first brutally clubbing, then stabbing Emargo. Nancy identified the defendant's knife as the murder weapon; Beth was not certain if the exhibit shown was "the exact one" he took to the lake. Both were certain,

---

[39]See *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986); *State v. Braun*, 82 Wn.2d 157, 165, 509 P.2d 742 (1973).

[40]*Guloy*, 104 Wn.2d at 425; *State v. Bergman*, 44 Wn. App. 271, 275, 721 P.2d 522 (1986).

[41]*Guloy*, 104 Wn.2d at 425; *State v. Stephens*, 93 Wn.2d 186, 190–91, 607 P.2d 304 (1980).

however, that the defendant possessed and used a knife to inflict multiple stab wounds on the victim. Both of these witnesses were extensively cross–examined but adhered to their testimony throughout.

Furthermore, the defendant's alibi was seriously damaged by the testimony of two witnesses who said he was not home the morning after the murder, and, principally, of course, by his own separate confessions of guilt and admissions made to a remarkably broad circle of friends and acquaintances. Why say "we killed her" if he played no part in the murder? His alibi also was impeached by a witness who testified that he saw the defendant, along with McKee, Emargo and the two young women, leave the McKee apartment at approximately 3:30 a.m. on September 27. (Although the defense argued that this witness confused the defendant with Flota, the witness insisted under oath that he recognized the defendant.)

When we turned to the harmless error test in *State v. St. Pierre,* 111 Wn.2d 105, 759 P.2d 383 (1988) to consider whether the admission of the declarant's statement implicating the defendant in the Achord murder prejudiced the defendant, we answered in the affirmative. This was because the declarant's statement was the only evidence directly linking the defendant to Achord's murder and was crucial to the State's case.[42] The Court of Appeals in a similar case found the admission of a declarant's unreliable videotaped statements prejudicial error when the State conceded that its case was very weak without the videotape.[43] Here, the State's case was strong even without the McKee and Flota statements. Those statements were essentially reproduced by the testimony of Nancy and Beth. Moreover, that testimony was not the only untainted evidence directly linking the defendant to Emargo's murder. In this case, the defendant seemingly told every friend

---

[42]*State v. St. Pierre,* 111 Wn.2d 105, 119, 759 P.2d 383 (1988).

[43]*State v. Hoskinson,* 48 Wn. App. 66, 75, 737 P.2d 1041 (1987).

who would listen first of his intention to kill the victim and then of his having done so. Two witnesses testified that the defendant said he wanted to kill Emargo. Five other witnesses testified that he told them he took part in her murder. All of these statements were voluntarily made by the defendant to the witnesses separately and all but one were made before his arrest. It is also appropriate to point out in this regard that the McKee and Flota statements were initially injected into the trial by the defense and were an integral part of the defense trial strategy. Thus, under the somewhat unusual facts of this case, the statements in question may well have helped the defense more than the State.

We conclude that there is overwhelming evidence in this case, quite apart from the tape–recorded statements in question, to support the defendant's conviction of murder in the first degree; admission of those statements was harmless beyond a reasonable doubt.

The defendant's conviction for first degree murder is affirmed.

CALLOW, C.J., and BRACHTENBACH, DOLLIVER, DURHAM, and GUY, JJ., concur.

DORE, J., concurs in the result.

UTTER, J. (dissenting)—I dissent. Federal law requires us to reverse a conviction obtained in contravention of a defendant's rights under the United States Constitution unless the State proves that the error was harmless *beyond a reasonable doubt. Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, 24 A.L.R.3d 1065, *reh'g denied,* 386 U.S. 987 (1967). Because the prosecution has not proven that the error was harmless beyond a reasonable doubt, we must reverse. *See State v. Guloy,* 104 Wn.2d 412, 425, 705 P.2d 1182 (1985) (State bears the burden of proving error harmless), *cert. denied,* 475 U.S. 1020 (1986); *State v. St. Pierre,* 111 Wn.2d 105, 119, 759 P.2d 383 (1988) (same). In a recent confrontation clause case, the United

States Supreme Court reaffirmed its commitment to the harmless beyond a reasonable doubt standard. *See Delaware v. Van Arsdall,* 475 U.S. 673, 89 L. Ed. 2d 674, 106 S. Ct. 1431 (1986). The "overwhelming untainted evidence" test we adopted in *Guloy* and applied to a confrontation clause violation in St. Pierre is a means of evaluating whether the error was harmless beyond a reasonable doubt. *State v. Evans,* 96 Wn.2d 1, 6–7, 633 P.2d 83 (1981) (Brachtenbach, C.J., concurring). *See also Guloy,* at 426 (citing Justice Brachtenbach's *Evans* concurrence with approval). Under this test, we may only affirm a conviction if "the untainted evidence is so overwhelming that it *necessarily* leads to a finding of guilt." (Italics mine.) *Guloy,* at 426.

Unless we apply the overwhelming untainted evidence test carefully and strictly, it will not perform its function. The doctrine allows us "to avoid reversal on merely technical or academic grounds". *Guloy,* at 426. It does not permit us to sustain convictions in which central testimony was improperly admitted into evidence. Proper application of our precedent insures "that a conviction will be reversed where there is *any reasonable possibility* that the use of inadmissible evidence was necessary to reach a guilty verdict." (Italics mine.) *Guloy,* at 426. If we fail to reverse when evidence at the heart of the prosecution's case is admitted in violation of the confrontation clause, we risk making a defendant's constitutionally guaranteed right to a fair trial meaningless.

The record shows that the untainted evidence is not so overwhelming that it necessarily leads to a finding of guilt. Indeed, the jury which convicted Whelchel failed to reach a verdict during its first three votes even though it considered the tainted testimony. Clerk's Papers, at 309 ("As a jury we have voted 3 times, looked at all the evidence and *cannot* reach a unanimous verdict."). Because all of the evidence taken together did not appear overwhelming to the jury which convicted Whelchel, we cannot conclude that the untainted evidence alone is overwhelming.

The untainted evidence is not overwhelming. On the contrary, the evidence is contradictory on almost every point. It is reasonably possible, indeed fairly likely, that the jurors convicted only because the statements improperly admitted into evidence took away reasonable doubts which the contradictory statements in the rest of the evidence may have left in their minds.

The majority fails to see this because it does not examine the evidence contradicting the testimony supporting the conviction. The Supreme Court's opinion in *Van Arsdall,* however, requires us to consider the presence of evidence contradicting prosecution witnesses on key points in evaluating harmless error. *Van Arsdall,* 475 U.S. at 684.

The physical evidence in this case is especially weak. At trial, the defense introduced table legs allegedly used to beat Emargo. These contained no traces of blood, hair, or fingerprints. Report of Proceedings, at 1094–1108. The prosecution claims the table legs used were never found.

The prosecution found the fingerprint of Jerry McKee on the knife allegedly used to kill Emargo, but no fingerprint of Whelchel. Report of Proceedings, at 1302–03. The type O blood found on the knife could be either Emargo's or Whelchel's. Report of Proceedings, at 1085, 1087, 2117. Since McKee was convicted of murdering her with this weapon, it might very well be only Emargo's blood. Witnesses testified that McKee wanted Emargo dead and pulled the knife from her back.

Moreover, Whelchel had an alibi. He did not plead the Fifth Amendment. Rather, he took the stand and explained what he did the night of the murder. Both his parents and his sister verified his alibi. The majority's failure to take this testimony into account violates *Van Arsdall.*

The two witnesses who placed Whelchel at the scene of the crime, Nancy Hughes and Beth Packer, had an interest in testifying against him. The Grant County Prosecutor agreed to try them as juveniles rather than adults and allowed Hughes to plead guilty to rendering criminal assistance, a crime carrying a much lighter sentence than

murder, in exchange for their testimony. Report of Proceedings, at 587–88; 639–40. The statements of codefendants are, of course, suspect. Majority, at 722; *Bruton v. United States,* 391 U.S. 123, 136, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968).

The majority's factual statement is based on the testimony of these two witnesses. Majority, at 711. We cannot be certain a jury would have found their stories credible without the collaborative statements improperly admitted. In fact, defense counsel showed that their statements contradicted earlier statements they had made. The impeached statements include facts critical to the result reached. For example, Hughes' statement that Whelchel indicated he planned to kill Emargo prior to the event contradicted her earlier statement that she did not anticipate any problem when they went to the lake the night Emargo was killed. Report of Proceedings, at 562. This testimony might be critical to a jury's decision on premeditated murder in the absence of the tainted testimony. Although Hughes claimed that Whelchel stabbed the victim, as the majority states, she admitted on cross examination that she did not see Whelchel's knife at the lake where the murder took place. Report of Proceedings, at 597. Nor did she say that she actually saw him stab her.

The majority also uncritically relies on the testimony of a witness that Whelchel left the apartment with the others at 3:30 a.m. on the night of the murder. This witness' testimony is arguably erroneous. He testified that he saw five people leave the apartment on the night of the murder and that one of those people was Whelchel. Report of Proceedings, at 741. The victim plus the four people already convicted of murdering or helping murder Emargo add up to five. Either there were more people there than he stated or his identification of Whelchel was erroneous. Inasmuch as the witness saw only the back of the person he claims is Whelchel, Report of Proceedings, at 740, it is possible that he misidentified one of the party. We ought not to base a harmless error decision on our conviction that the witness

could not have confused Whelchel with Flota, who has been convicted of murdering the girl in a fair trial.

Several witnesses reported that Whelchel said "we killed her," as the majority states. The majority fails to mention that one witness specifically contradicted a report that Whelchel admitted killing the victim. Other witnesses stated that Whelchel had said that "they killed her." Others stated that he explicitly denied being a murderer.

The evidence not tainted by admission of the tapes is far from overwhelming. Our holding in this case cuts the number of eyewitnesses to two. Both of these eyewitnesses have severe credibility problems because they were accomplices to the murder. They have an interest in implicating Whelchel whether he is guilty or not. The combination of two witnesses of dubious credibility and no physical evidence might create a reasonable doubt in a juror's mind about whether Whelchel committed the murder.

The improper admission of critical evidence justifies a new trial by itself. But this was not the only error found in this case. The Court of Appeals found that the prosecutor made an improper argument in closing. The prosecutor appealed to the victim's memory and the jurors' emotions by addressing the dead woman, using the name she used in everyday life:

> Margo, I've carried the ship as far as I can. It's up to the jury. It's now in the hands of the jury. Margo, I can look this jury in the eye—
>
> MR. MCKEAN: I object to this.
>
> MR. KLASEN: —and I can, on the basis of the evidence, ask this jury on the basis of the evidence to return a verdict of guilty. And I'm doing that Margo.

Report of Proceedings, at 2172. This kind of impropriety will cease the day this court announces a rule that such statements will always cause reversal. We need not announce such a rule in this case, however. In this case, the appeal to emotion combines with the improper admission of evidence crucial to the prosecution's case. We should have little difficulty in recognizing that a "reasonable possibility" exists that the inadmissible evidence and the improper

appeal to emotion were necessary to the jury's guilty verdict. A "reasonable possibility" that errors were necessary to the jury's verdict precludes the conclusion that the errors were "harmless beyond a reasonable doubt." *See Guloy,* at 426. Accordingly, federal law requires reversal.

SMITH, J., concurs with UTTER, J.

Reconsideration denied February 13, 1991.