IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 78688-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RENARD KEVIN BENTON, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 9, 2020 |

BOWMAN, J. — Renard Kevin Benton's trial for domestic violence witness intimidation and domestic violence assault in the third degree included testimony from two police officers who conducted a "protective sweep" of his apartment after detaining him in the outside hallway. The State concedes the warrantless search did not properly constitute a protective sweep and required suppression of the evidence obtained as a result of the search, specifically the officers' observations of the inside of the apartment. Because of the credibility issues inherent in this case, we cannot say that the untainted evidence is so overwhelming as to necessarily lead to a finding of guilt. Therefore, we reverse and remand for a new trial.

FACTS

While walking her dogs early on the morning of April 22, 2017, Tonja Degolier saw a young woman with blond hair hobbling toward her. The young woman seemed unable to stand upright. She was bent over and holding her back. Degolier also saw blood on the woman's face and hand. The woman, Summer Smith, appeared to be emotionally distraught and in pain. Degolier called 911. With difficulty, Smith communicated that her boyfriend Benton had "beat her up" in their apartment.

Responding police officers found Smith doubled over in pain and crying. She appeared disheveled, as if she had been in a physical altercation. Smith had a bloody lip, bloody nose, one of her false eyelashes had been ripped off, and her artificial fingernails had been ripped off one hand. She told officers that Benton had assaulted her with something resembling a police baton. She also explained that he had thrown her against the wall several times. According to Smith, she had been talking to somebody and Benton became jealous and attacked her. She said, "He told me if I called the police, he was going to kill me." The officers obtained photographs of Smith's injuries. An ambulance transported Smith to the hospital.

Upon arrival at the hospital, Smith told the emergency room physician she had been beaten with a nightstick and repeatedly thrown against a wall. She complained of pain all over, with emphasis on her tailbone. Upon examination, Smith had multiple bruises, an abrasion on her forehead that was very tender to touch, and tenderness over her tailbone area. The emergency room physician

2

obtained laboratory data and imaging to rule out serious injuries. Smith admitted to cannabis use but denied using any other drug or alcohol.[1] A urinalysis performed at that time showed evidence of alcohol, amphetamines, benzodiazepines, and cannabinoids in her system. The X-rays of Smith's chest, sacrum, and coccyx were negative for serious injuries. The CAT[2] scan of her head and cervical spine showed only a contusion on her forehead. The doctor prescribed narcotics for pain and eventually discharged Smith from the hospital.

Three police officers went to Benton's apartment. They knocked and announced "Seattle Police" multiple times before Benton answered the door. Benton appeared disheveled. He wore torn cargo shorts and had a swollen ear with a bleeding cut. An officer asked Benton to stand in the hallway outside the apartment. The police inquired about Smith, but Benton denied knowing her. An officer advised Benton of his Miranda[3] rights and detained him in handcuffs. After further discussion, Benton admitted to knowing Smith, explaining he heard banging on his door so she may have come by the apartment while he had been asleep.

After handcuffing Benton, two officers went inside the apartment without permission or a court order. Two men were sitting on furniture in the family room. One officer stayed with these men while the other officer performed a sweep of the other rooms of the apartment. From the bags of garbage and

---

[1] The record is unclear as to whether Smith reported cannabis use specific to that day or general usage.

[2] Computerized axial tomography.

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

alcohol bottles all around, it looked like there had been a party. According to the officer in the family room, "you could obviously see there was some kind of disturbance happened." Liquor bottles, chairs, and a lamp were all tipped over onto the floor in disarray. One of the chairs was missing a leg that was nowhere in sight. The rest of the apartment showed other signs of disturbance. In the bedroom, the "closet and everything in the bedroom was just everywhere. It was like a tornado. The bedding was off, the TV[4] was laying on its screen, the clothes in the closet were all down on the floor." The black metal bar for the closet was down and women's clothes were scattered around the room.

The State charged Benton with assault in the third degree and intimidating a witness, both with domestic violence allegations. Before trial, Benton moved to exclude the officers' observations of the inside of his apartment obtained through the warrantless search. The trial court denied the motion, concluding the officers gathered the information during a valid protective sweep of the apartment.

The jury heard the testimony of the officers' observations of Benton's apartment. The jury also learned information about Smith, who did not testify. Smith had prior convictions involving acts or statements of dishonesty, specifically theft in the third degree, making a false or misleading statement to a public servant, and vehicle prowl in the second degree. Additionally, Smith recanted her statement shortly before the trial. A paralegal associated with the case testified that she received a telephone call from Smith stating that the incident had been a "misunderstanding." According to Smith, she had been in a

---

[4] Television.

4

fight that day and then went to Benton's house, heard female voices, and became upset. Smith told the paralegal she was pregnant and asked to lift the no-contact order associated with the criminal case.

The jury acquitted Benton of witness intimidation and third degree assault. However, the jury found him guilty of the lesser offense of domestic violence assault in the fourth degree. The court sentenced Benton to 364 days in jail. Benton timely appeals.

## ANALYSIS

Warrantless searches violate the state and federal constitutions unless one of the narrow exceptions applies. State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). In this case, the State properly concedes the search of Benton's apartment exceeded the scope of the protective sweep doctrine used to justify the warrantless search. In State v. Chambers, 197 Wn. App. 96, 125-27, 387 P.3d 1108 (2016), we concluded that arrest of a suspect outside of their home does not support a protective sweep of the house incident to arrest without more than a generalized suspicion of the possibility of danger. Just as in Chambers, the police officers detained Benton outside of his apartment and then conducted the warrantless search to check for other possible victims or additional suspects. The State acknowledges the warrantless search of Benton's apartment was based solely on generalized suspicion and was, therefore, unconstitutional.

"The exclusionary rule mandates the suppression of evidence gathered through unconstitutional means." State v. Duncan, 146 Wn.2d 166, 176, 43 P.3d 513 (2002). Therefore, the trial court should have suppressed the fruits of this search, specifically the officers' observations of the inside of Benton's apartment. Such constitutional error is presumed prejudicial. Chambers, 197 Wn. App. at 128. However, a constitutional error is harmless "if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result without the error." State v. Whelchel, 115 Wn.2d 708, 728, 801 P.2d 948 (1990). We apply the "overwhelming untainted evidence" test to evaluate the magnitude of the error. State v. Thompson, 151 Wn.2d 793, 808, 92 P.3d 228 (2004). " 'Under this test, we consider the untainted evidence admitted at trial to determine if it is so overwhelming that it necessarily leads to a finding of guilt.' " Thompson, 151 Wn.2d at 808 (quoting State v. Smith, 148 Wn.2d 122, 139, 59 P.3d 74 (2002)). The State bears the burden of proving harmlessness beyond a reasonable doubt. Chambers, 197 Wn. App. at 128.

This case mainly rested on Smith's credibility. Smith did not testify at trial. Instead, the jury heard from Smith through her statements to Degolier, police, firefighters, and medical staff. She repeatedly stated that her boyfriend Benton had beaten her. She was distraught and in pain with bruises and lacerations. The State provided photographic evidence of Smith's injuries.

However compelling the testimony about Smith's statements, appearance, and injuries, the jury also learned several significant facts that cast doubt on her credibility. In the hospital shortly after reporting the assault, Smith's urinalysis

tested positive for alcohol, cannabinoids, methamphetamines, and benzodiazepines. While none of the police officers reported suspicion of intoxication, Degolier noted Smith's difficulty communicating and mentioned possible substance use to the 911 operator. Degolier told the 911 operator, "[S]he looks like she might be on — under the influence of something." Degolier testified that Smith might have been under the influence because her eyes were very red and she could not speak clearly. Degolier was unsure whether these issues stemmed from Smith's emotional distress or intoxication. Based on Degolier's statements and the positive urinalysis, the jury had significant evidence of contemporaneous drug and alcohol use to consider in assessing Smith's account of the assault.

Additionally, Smith had three prior convictions for crimes of dishonesty, including making false reports to a public servant. The jury could consider this false statement conviction in conjunction with Smith's recantation in which she said her injuries occurred elsewhere before going to Benton's apartment. These facts undoubtedly negatively impacted the credibility of her reporting of the incident.

Other than Smith's statements and injuries, the main evidence of Benton's role in the altercation came from the police officers' reports of the interior of the apartment. The State validated Smith's allegations through the officers' observations, saying, "[T]he officers made observations inside the apartment that corroborate everything that Summer Smith said to them." The State further

noted:

> The apartment that she said the altercations occurred in, the assault, it was a disaster. There was broken furniture, alcohol bottles, television tipped over, sheets ripped off the bed, women's clothing in the closet. And what was sitting on top of it? A black metal closet bar. Similar to what Summer Smith described having been beaten with. She said her phone was thrown out the window, the screen was busted out.

Further, the State argued:

> Something happened inside that apartment that morning, it happened to Summer Smith, and the defendant did it. And he left [a] trail of that inside that apartment. It was a mess. Alcohol, broken furniture, TV tipped over, and that bar sitting inside that closet.

Clearly, the State heavily relied on the police officers' testimony about the condition of Benton's apartment to corroborate Smith's statements. This is the very evidence that should have been excluded due to the unconstitutional search. Without the officers' description of the apparent disturbance in the apartment, the State's case consisted mainly of the evidence of Smith's injuries and her statements. However, drug and alcohol use at the time of those statements, prior crimes of dishonesty, and recantation of the allegations significantly undermine Smith's credibility.

Given these issues of credibility, we are not convinced beyond a reasonable doubt that any reasonable jury would have convicted Benton without the improperly admitted evidence to buttress Smith's statements. As a result, we cannot conclude the admission of the officers' observations obtained from the

unconstitutional search was harmless error. Therefore, we must reverse the conviction and remand for retrial.

WE CONCUR: