110 P.3d 245 (2005)
STATE of Washington, Respondent,
v.
Kim Heichel MASON, Appellant.
No. 52824-6-I.
Court of Appeals of Washington, Division 1.
April 18, 2005.
Reconsideration Denied June 10, 2005.
*246 Nancy P. Collins, Washington Appellate Project, Seattle, WA, for Appellant.
Andrea R. Vitalich, King County Prosecutor's Office, Seattle, WA, for Respondent.

PUBLISHED IN PART
AGID, J.
¶ 1 Kim Mason was convicted of first degree aggravated murder after his friend, Hartanto Santoso, disappeared. Mason appeals, arguing the trial court violated his Confrontation Clause rights by permitting witnesses to testify about statements Santoso made before he disappeared. We hold that out-of-court statements made by unavailable witnesses while in peril, for the purpose of seeking protection, are not "testimonial" and do not fall within the Confrontation Clause's scope as defined by Crawford v. Washington. We affirm.

FACTS
¶ 2 Kim Mason met Hartanto Santoso while the two worked in the same retirement home. Mason was in his early twenties and was a kickboxing instructor and competitor. Santoso, in his early thirties, was an immigrant from Indonesia. The two were friends for approximately two years. Toward the end of 2000, Mason began running into financial difficulties, and his friends suspected that he was addicted to drugs. At that time, Santoso gave money to Mason and helped him find additional jobs.
¶ 3 On the afternoon of January 23, 2001, Mason invited Santoso to his home. While Santoso's back was turned, Mason strangled him into unconsciousness then bound and gagged him with duct tape. When Santoso awoke, Mason threatened him with a loaded gun and forced him to write his roommate a letter saying that he was leaving town. Mason then forced Santoso to write him a check for the balance of his bank account. At that point, Mason attempted to fill a syringe with drain cleaner and threatened to inject Santoso. Santoso calmed him down and ultimately convinced Mason to release him. Santoso promised not to contact the police.
¶ 4 The next day, Santoso's friend talked Santoso into going to the police department to report the crime. Santoso first went to the Kirkland police, but later that day he spoke with the Redmond police because they had jurisdiction. Police searched Mason's home and found items that corroborated Santoso's description of the events. After he was arrested, Mason told the police that he strangled and bound Santoso and threatened him with a gun, but asserted he did so in self-defense because Santoso had attempted to grab Mason's genitals. Mason claimed the gun was unloaded and that he never displayed a syringe or demanded money from Santoso.
¶ 5 Mason was charged with first degree kidnapping and first degree attempted robbery, but on January 31, 2001, he was released pending trial. When Santoso learned that Mason had been released, he called his King County victim's advocate and expressed his profound fear that Mason would kill him. The victim's advocate helped Santoso obtain a no contact order.
¶ 6 At approximately 10:45 pm on February 19, 2001, Santoso's neighbors heard glass breaking and muffled noises coming from Santoso's apartment. They saw Santoso's car leave the parking lot about 10 minutes later. The next day, neighbors noticed that Santoso's front door was open and a trail of blood led from the door to the parking lot. Police found massive amounts of blood in Santoso's bedroom. The bedroom window was broken, and a cement cinder block was *247 on the floor. On February 21, police found Santoso's car in the Sea-Tac airport parking lot. The parking stub found in the car indicated that it entered the lot on February 19 at 11:51 pm. There was a large quantity of blood inside the car, and some was on the car's exterior. The blood in the apartment, parking lot, and automobile all belonged to Santoso. His body was never found, but police presumed he was dead. Since February 19, 2001, Santoso has not collected any paychecks, established a public record of any kind, or contacted any friends or relatives.[1]
¶ 7 When questioned, Mason told the police that he was at his girlfriend Marina Madrid's home on February 19, and Madrid corroborated that alibi. Police later learned that Mason had a significant cut on his upper right thigh that was likely inflicted on February 19 by a knife. In early April, police learned that Mason changed his name and put a false address on his driver's license. Also in April, Marina Madrid admitted to police that on the evening of February 19, Mason called her and asked her to pick him up at the airport and to bring a change of clothes. When Madrid arrived at the airport, Mason had blood on his hands and said, "Santoso won't be a problem anymore." Madrid noticed a cut on Mason's leg, and Mason explained that he had somehow gotten cut during the attack. Madrid helped Mason deposit his bloodied clothes in a dumpster and pick up his car, which was parked near Santoso's residence. Madrid also helped stitch and bandage Mason's cut. During the following weeks, Mason told Madrid that he broke Santoso's bedroom window, entered the apartment, and stabbed Santoso multiple times. He put the body in Santoso's car, concealed the body in an undisclosed location, and left the car at the airport.
¶ 8 Madrid later told the police that Mason had thrown a knife out of the car window while they drove along I-405. Police found the knife in bushes along the highway, and Santoso's blood was on the knife. Police also found Santoso's blood on the passenger side floorboard of Madrid's car, and they found Mason's blood on the passenger seat of Madrid's car. There was a mixed blood sample on the driver's seat of Santoso's car, near where the driver's right thigh would be.
¶ 9 Mason was charged with first degree aggravated murder. After a 10-week jury trial, Mason was convicted and sentenced to life imprisonment without possibility of parole.

DISCUSSION

I. Mason's Right to Confront Witnesses

A. The Sixth Amendment and Crawford v. Washington

¶ 10 Mason challenges the trial court's decision to allow police officers and a victim's advocate to testify about statements Santoso made to them. He argues that admitting the out-of-court statements violated his right to confront witnesses against him, as guaranteed by the sixth amendment of the United States Constitution and article I, section 22 of Washington's Constitution. Mason relies on Crawford v. Washington,[2] a case recently decided by the United States Supreme Court.
¶ 11 Before Crawford, an out-of-court statement made by an unavailable witness was admissible if the statement had adequate indicia of reliability.[3] A trial court could infer reliability if the statement fell within a firmly rooted hearsay exception.[4] The excited utterance exception is a firmly rooted hearsay exception,[5] and thus out-of-court *248 statements made by unavailable witnesses were admissible if they qualified as excited utterances.
¶ 12 But in Crawford, the Supreme Court stated that "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes."[6] Instead, a court may admit a witness's out-of-court testimonial statements only if the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness.[7] Non-testimonial statements may be admitted if they fall within a hearsay exception,[8] and the Crawford rule applies only to those statements that are "testimonial."
¶ 13 In this case, the trial court admitted statements Santoso made to four police officers and a victim's advocate. These statements involved Santoso's description of the January 23rd incident, as well as his profound fear of Mason after the incident. Because Mason's trial was held before Crawford, the trial court admitted many of Santoso's statements as excited utterances. But under Crawford, if the statements were testimonial, they were inadmissible because Mason never had the opportunity to cross-examine Santoso. We must therefore examine Santoso's statements to determine whether they were testimonial.
¶ 14 The Supreme Court declined to provide a comprehensive definition of "testimonial,"[9] but it did define "testimony" as "`[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'"[10] "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."[11] As examples of testimonial statements, the Court lists affidavits, custodial examinations, depositions, prior testimony,[12] confessions, or similar pretrial statements that the declarant would reasonably expect to be used in a prosecution.[13] The Court also refers to "`statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial[.]'"'[14] Statements taken by police officers during the course of interrogations are testimonial.[15]
¶ 15 Crawford addresses statements made to government officials during examinations or interrogations initiated by those officials.[16] As soon as the focus moves to disputed out-of-court statements voluntarily made by the witness during witness-initiated contact, confusion arises. For example, since Crawford, several courts have considered whether statements made during 911 calls are testimonial for Sixth Amendment *249 purposes.[17] When determining whether statements voluntarily made to government officials during witness-initiated contact are testimonial, courts have looked to a variety of factors. These include the extent to which the interaction takes place in a formal setting such as structured questioning or recording,[18] whether the statement was made as part of the incident or part of the prosecution,[19] and whether the witness had time for contemplation before giving the statement.[20]
¶ 16 But central to each of these factors, and most important in determining whether a statement is testimonial in this context, is the witness's purpose in initiating police contact and making the statement.[21] The witness's purpose is essential because it goes to whether or not the declarant would reasonably expect his or her statement to be used at a later trial, a factor which is the centerpiece of the Supreme Court's definition of "testimonial."[22] Courts must ask whether the declarant initiated the police contact to get help, or whether he or she did so to report a crime or provide information to assist police in investigating, apprehending, or convicting a suspect.[23]
¶ 17 If a declarant makes a statement while seeking protection, it is unlikely that he or she intends to make a formal statement, is aware that he or she is bearing witness, or is aware that his or her utterances might ultimately be used in a prosecution. The witness's focus is on getting help, not establishing or proving a fact to further a prosecution. Therefore, statements seeking help made by someone in immediate peril are not testimonial. We hold that, in determining whether a statement is testimonial for Sixth Amendment purposes, courts must perform a fact-specific analysis to ascertain: (1) whether the declarant initiated the statement, (2) the formality of the setting, and (3) the declarant's purpose in making the statement. We further hold that statements made while in peril for the purpose of seeking protection, rather than for the purpose of bearing witness, are not testimonial and thus not subject to Crawford's cross-examination requirement.

1. John Haslip's Testimony

¶ 18 First, Mason challenges the trial court's decision to admit certain aspects of John Haslip's testimony. Haslip, a corporal with the Kirkland police department, testified that on January 24, Santoso and a friend came to the police station and spoke with him. According to Haslip, Santoso's eyes were bloody, his face was swollen, and his neck was bruised. Santoso appeared to be extremely frightened. Haslip asked Santoso questions to figure out what had happened to him, and Santoso was reluctant to answer at first. Eventually, Santoso told Haslip about what happened at Mason's home the day before. After speaking with Santoso, Haslip realized that the incident took place in Redmond, so he referred Santoso to the Redmond police department.
¶ 19 The court admitted this testimony as an excited utterance under ER 803(a)(2). But, assuming this was error under Crawford, the error was harmless. A constitutional error is harmless if, beyond a reasonable doubt, a jury would have reached *250 the same result without the error.[24] In this case, the jury would have reached the same result without Haslip's recitation of Santoso's out-of-court statements. First, forensic evidence and Marina Madrid's testimony alone could have been sufficient to convict Mason. And second, Santoso's roommate, employer, emergency room physician, and sister all testified about Santoso's description of the January 23rd incident. None of this testimony violated Crawford,[25] and Mason does not dispute it.

2. John Berberich's Testimony

¶ 20 Mason next disputes the admissibility of certain portions of John Berberich's testimony. Berberich is a detective with the Redmond police department who responded to Haslip's call and met with Santoso on January 24. He described Santoso's visible injuries and testified that while he spoke, Santoso periodically cried, and his tears were blood-red. Santoso told Berberich that he was afraid for his life.
¶ 21 While Mason does not challenge the admission of Santoso's statement about being afraid, he does challenge Berberich's frequent references to Santoso's out-of-court statements while testifying about items he found in Mason's home, as these items corroborated Santoso's description of the January 23rd incident. For example, Berberich testified that he seized a roll of duct tape from Mason's home because Santoso told him that he had been duct taped on his ankles, wrists, and face. And Berberich seized a loaded firearm found in Mason's home because Santoso had told him that Mason displayed a firearm during the incident. The court instructed the jury on several occasions that the testimony was being admitted only to explain why Berberich seized certain items from Mason's home and that it should not consider the testimony for the truth of the matter asserted within the statement.
¶ 22 The trial court did not err by permitting this testimony because the testimony was clearly not admitted for the truth of the matter asserted.[26] The trial court thoroughly instructed the jury that it could consider the statements only to explain why Berberich seized certain items.[27] The prosecuting attorney did occasionally argue as if the information were admitted for the truth of the matter asserted, but the defense did not object and Mason does not raise the issue on appeal. In this context, the statements were not admitted so that Santoso could bear witness against Mason, and thus they were not subject to Crawford's limitations.

3. Kristy Roze's Testimony

¶ 23 Mason also contests the admission of certain portions of Kristy Roze's testimony. Like Berberich, Roze is a detective with the Redmond police department. She testified that Santoso expressed fear about his safety, and the court admitted the statement to establish Santoso's state of mind at that time. Roze also testified that Santoso asked her if he could sleep at the police department under a desk or in a jail cell because he was afraid.
¶ 24 Roze's testimony does not implicate Crawford concerns. First, the court did not admit Santoso's statements to prove the truth of the matter asserted. Second, these statements do not implicate Mason, nor do they prove some fact helpful to the prosecution. *251 Nor would Santoso have any reason to expect these statements to be used for prosecution purposes. Instead, Santoso was expressing his fear and asking for Roze's help to ensure his safety. The trial court did not err.

4. Anne Malins' Testimony

¶ 25 Detective Anne Malins, also with the Redmond police department, testified that she took Santoso's checkbook records into evidence. She explained that she did so because Santoso stated that he had previously written one check to Mason and had begun to write a check during the January 23rd incident. The court admitted the statement only to establish why Malins took the checkbook records, and it instructed the jury about the limited reason for admitting the testimony. For the same reasons discussed in the context of Berberich's testimony, the trial court did not err here. The court clearly limited the admissibility of this testimony, and in this context, Santoso's statement was not introduced to implicate Mason. Crawford is inapplicable.

5. Linda Webb's Testimony

¶ 26 Finally, Mason challenges the admission of Linda Webb's testimony about certain statements Santoso made to her. Webb, a domestic violence victim's advocate, testified that she assisted Santoso with "safety planning" on January 29, six days after the assault. She testified that Santoso's eyes were bright red, he was visibly shaking, and he was crying. She also testified that he was reluctant to get a protective order because he was afraid. Webb testified that Santoso phoned her because Mason had recently been released from jail, and Santoso was hysterical and frightened. He told Webb that Mason was going to kill him; that he knew he was going to die. He begged Webb to put him in a jail cell or let him sleep in her office so he could be safe. Webb also testified that she and Santoso discussed the possibility of his relocating, but that he could not leave his job because he was sending money to his family in Indonesia. And Webb testified that Santoso expressed his fear that Mason's father, a retired police chief, would retaliate against Santoso as police often did in his native Indonesia.
¶ 27 Mason argues that a reasonable person in Santoso's position would expect these statements to be used to further the investigation and prosecution against Mason. We disagree. Every statement Webb testified to involved Santoso's profound fear and his pleas for help. Santoso was seeking protection, not bearing witness to a crime. And because Webb was acting as a victim's advocate charged with helping Santoso find safety, Santoso had little reason to expect that his statements to her would ultimately be used to prosecute Mason. We conclude that these statements were not testimonial and that the trial court properly admitted them.

B. Washington's Confrontation Clause: Article One, Section 22

¶ 28 Mason also argues that the trial court's decision to admit the testimony discussed above violated his confrontation rights guaranteed by article I, section 22 of the Washington Constitution, because that clause is more protective of confrontation rights than is the Sixth Amendment. We reject Mason's argument.
¶ 29 In State v. Gunwall, the Washington Supreme Court held that a court must consider certain factors when determining whether Washington's constitution should be interpreted as extending broader rights than the federal constitution.[28] Parties asserting a violation of the state's constitution must brief and discuss these factors.[29] But a party need not provide a Gunwall analysis if the Washington Supreme Court has already analyzed the constitutional provision in the context at issue.[30] Instead, the court must analyze the party's claim according to "established principles of state constitutional jurisprudence."[31] *252 If the Supreme Court has not done the independent state constitutional analysis in that context and the party does not perform a Gunwall analysis, the reviewing court must use the federal constitutional analysis.[32]
¶ 30 In this case, Mason argues that he did not need to provide a Gunwall analysis because the Washington Supreme Court already recognized that the state constitution's confrontation right is broader than the federal constitution's. Mason cites State v. Foster[33] and State v. Smith[34] to support this proposition. In Foster, the Supreme Court analyzed whether a statute permitting child victims to testify using closed-circuit television violated the state or federal confrontation clauses. Although the lead opinion held that the state constitution's Confrontation Clause is identical to that of the federal constitution,[35] five concurring and dissenting justices concluded that Washington's Confrontation Clause provides greater protection.[36] But Foster did not establish a firmly-rooted principle of state constitutional jurisprudence, as it only discussed the constitutional provisions in a context entirely distinct from the one presented here.
¶ 31 In Smith, the court examined whether a trial court may consider the possibility of testimony using closed-circuit television when determining whether a witness is unavailable for Confrontation Clause purposes. The court recognized the majority opinion in Foster, but refused to analyze the defendant's state constitutional claim because the defendant had not briefed the Gunwall factors and the court had "not yet decided whether article I, section 22 provides greater protection than the federal provision in this situation."[37] The Supreme Court has thus made it clear that a party asserting an independent state basis for its constitutional argument must provide a Gunwall analysis unless the court has already analyzed the argument in that context. The Supreme Court has never addressed the confrontation issue in the context currently before us. Therefore, in the absence of a Gunwall analysis, we reject Mason's state constitutional argument.

C. Forfeiture by Wrongdoing

¶ 32 The State also argues that Mason's confrontation claim fails on alternative grounds. According to the State, Mason forfeited his confrontation rights by causing the witness to be unavailable in the first place. The doctrine of forfeiture by wrongdoing[38] has not been expressly adopted by Washington courts, and the State urges the court to do so now. But because we conclude that there has been no harmful violation of Mason's confrontation rights, we need not reach this issue.
¶ 33 Mason also argues the court erred by (1) excluding an opinion of the defense's DNA (deoxyribonucleic acid) expert, (2) permitting certain witnesses to testify that Santoso was dead and Mason had murdered him, (3) admitting evidence of Mason's prior bad acts, (4) failing to include aggravating factors in the "to convict" jury instruction, (5) permitting the jury to convict of aggravated murder despite insufficient evidence of burglary as an aggravating factor, and (6) informing the jury that the State was not seeking the death penalty in this case. The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. See RCW 2.06.040; CAR 14.
KENNEDY and BAKER, JJ., concur.
NOTES
[1] Mason's defense focused on the possibility that Santoso staged his own disappearance.
[2] 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
[3] State v. Thomas, 150 Wash.2d 821, 855-56, 83 P.3d 970 (2004) (citing State v. Strauss, 119 Wash.2d 401, 415, 832 P.2d 78 (1992)).
[4] Id. at 856, 83 P.3d 970 (citing Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), abrogated by Crawford, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177).
[5] Id. at 853, 83 P.3d 970 (citing State v. Woods, 143 Wash.2d 561, 595, 23 P.3d 1046, cert. denied, 534 U.S. 964, 122 S.Ct. 374, 151 L.Ed.2d 285 (2001)).
[6] 124 S.Ct. at 1371.
[7] Id. 541 U.S. 36, 124 S.Ct. at 1369.
[8] Id. at 1374 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay lawas does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.").
[9] Id.
[10] Id. at 1364 (alteration in original) (quoting 1 N. Webster, An American Dictionary of the English Language (1828)).
[11] Id.
[12] This includes prior testimony from a preliminary hearing, before a grand jury, or at a former trial. Id. at 1374.
[13] Id.
[14] Id. at 1364 (quoting Brief for National Association of Criminal Defense Lawyers et al. as Amici Curiae 3).
[15] Id.
[16] See, e.g., id. at 1357-58 (the Crawford Court examined the admissibility of a tape-recorded statement made during a police interrogation); id. at 1359-63 (examining the historical background of the Confrontation Clause and discussing controversial examination practices); id. at 1363 ("the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused.").
[17] See, e.g., State v. Powers, 124 Wash.App. 92, 99 P.3d 1262 (2004) (citing People v. Moscat, 3 Misc.3d 739, 777 N.Y.S.2d 875 (2004); People v. Cortes, 4 Misc.3d 575, 781 N.Y.S.2d 401 (2004); Leavitt v. Arave, 371 F.3d 663, opinion amended and superseded, 383 F.3d 809 (9th Cir.2004)); State v. Wright, 686 N.W.2d 295 (Minn.Ct.App. 2004), review granted Nov. 23, 2004.
[18] See, e.g., State v. Forrest, 164 N.C.App. 272, 596 S.E.2d 22, 27, review on add'l issues denied, 359 N.C. 193, 607 S.E.2d 653 (2004); People v. Mackey, 5 Misc.3d 709, 785 N.Y.S.2d 870, 873-74 (2004) (citing People v. Newland, 6 A.D.3d 330, 775 N.Y.S.2d 308, leave to appeal denied, 3 N.Y.3d 679, 784 N.Y.S.2d 17, 817 N.E.2d 835 (2004)).
[19] See, e.g., Powers, 99 P.3d at 1266 (citing Moscat, 777 N.Y.S.2d at 880).
[20] See, e.g., Forrest, 596 S.E.2d at 27; Moscat, 777 N.Y.S.2d at 878.
[21] See, e.g., Powers, 99 P.3d at 1266; Mackey, 785 N.Y.S.2d at 874; Moscat, 777 N.Y.S.2d at 879; Wright, 686 N.W.2d at 302.
[22] Crawford, 124 S.Ct. at 1364.
[23] See, e.g., Powers, 99 P.3d at 1266; Mackey, 785 N.Y.S.2d at 874; Moscat, 777 N.Y.S.2d at 879; Wright, 686 N.W.2d at 302.
[24] State v. Whelchel, 115 Wash.2d 708, 728, 801 P.2d 948 (1990) (citing State v. Guloy, 104 Wash.2d 412, 425, 705 P.2d 1182 (1985), cert. denied, 475 U.S. 1020, 106 S.Ct. 1208, 89 L.Ed.2d 321 (1986); State v. Bergman, 44 Wash. App. 271, 275, 721 P.2d 522 (1986)).
[25] Crawford indicates that government officials must somehow be involved in the creation of a statement if the statement is to be deemed testimonial. In re T.T., 351 Ill.App.3d 976, 988, 287 Ill.Dec. 145, 815 N.E.2d 789 (2004).
[26] When out-of-court assertions are not introduced to prove the truth of the matter asserted, they are not hearsay and no Confrontation Clause concerns arise. Crawford, 124 S.Ct. at 1369 n. 9 (citing Tennessee v. Street, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)).
[27] Mason challenges the relevance of the non-hearsay purpose for which the court admitted these statements. But the evidence seized from Mason's home is relevant to show what took place on January 23. That incident is, in turn, relevant and admissible for reasons discussed below.
[28] 106 Wash.2d 54, 61-63, 720 P.2d 808 (1986).
[29] Id. at 62, 720 P.2d 808 (citing In re Rosier, 105 Wash.2d 606, 616, 717 P.2d 1353 (1986)).
[30] State v. Reichenbach, 153 Wash.2d 126, 101 P.3d 80, 84 n. 1 (2004) (citing State v. White, 135 Wash.2d 761, 769, 958 P.2d 982 (1998)).
[31] White, 135 Wash.2d at 769, 958 P.2d 982.
[32] Reichenbach, 101 P.3d at 84 n. 1 (citing State v. O'Neill, 148 Wash.2d 564, 582, 62 P.3d 489 (2003)).
[33] 135 Wash.2d 441, 957 P.2d 712 (1998).
[34] 148 Wash.2d 122, 59 P.3d 74 (2002).
[35] 135 Wash.2d at 466, 957 P.2d 712.
[36] Id. at 473-74, 481-94, 957 P.2d 712.
[37] 148 Wash.2d at 131, 59 P.3d 74 (emphasis in original).
[38] The doctrine is also known as forfeiture by misconduct or waiver by misconduct.