# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51179-7-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JAMES ANTHONY BITNER, | |
| Appellant. | |

MAXA, C.J. – James Bitner appeals his conviction for delivery of a controlled substance – methamphetamine. The State charged Bitner after law enforcement directed a confidential informant (CI) to purchase methamphetamine from him. The CI was unavailable to testify at Bitner's trial, but the trial court admitted into evidence her text message exchange with Bitner setting up the details of the transaction.

We hold that (1) the trial court did not err in admitting the CI's text messages as authenticated under ER 901 because the detective who testified had sufficient knowledge to authenticate them; (2) the trial court's admission of the text messages did not violate Bitner's confrontation right because they did not constitute hearsay; (3) Bitner's Statement of Additional Grounds (SAG) claims lack merit; and (4) the DNA collection fee imposed on Bitner must be stricken because his DNA previously was collected in connection with another conviction, but the trial court must determine if the criminal filing fee should be stricken based on Bitner's indigence.

Accordingly, we affirm Bitner's conviction, but we remand for the trial court to strike the DNA collection fee and to determine for purposes of the criminal filing fee whether Bitner was indigent as defined in RCW 10.101.010(3)(a)-(c).

FACTS

On August 24, 2016, Centralia police detective Chad Withrow directed a CI to arrange to purchase methamphetamine from Bitner at approximately 1:00 or 1:30 that afternoon. The CI also was going to purchase methamphetamine from others at Withrow's direction.

Withrow met with the CI after directing her to target Bitner. Withrow observed the CI sending and receiving texts indicating that the recipient was ready to complete the deal. The CI also showed Withrow prior texts in the same thread consistent with his instructions, arranging the deal for 1:30 PM at a KFC location in Centralia and setting the price for a "ball" – approximately 3.5 grams – at $100. Withrow read and took photographs of these text messages.

The text messages Withrow photographed read as follows:

[CI:] Will u be in town around 1? And do u got a ball?
11:21 AM

Yes an [*sic*] yes
11:21 AM

[CI:] Would u be able to meet me at kfc?
11:22 AM

[CI:] Im [*sic*] splitting it with someone and tell me the price
11:22 AM

Yes of corse [*sic*]
11:22 AM

[CI:] Okay
11:22 AM

100
11:23 AM

2

[CI:]  K
11:24 AM

[CI:]  About a half hour
12:26 PM

[CI:]  1:30ish
12:37 PM

U ready
1:20 PM

[CI:]  Yeah I will be just a few I had to pick up the $
1:20 PM

[CI:]  Im [*sic*] hurrying
1:20 PM

Ok
1:21 PM

[CI:]  Omw
1:27 PM

Ok
1:27 PM

Exs. 23, 24, 25.

Before the CI left to meet with Bitner, officers conducted a strip search of her and searched her purse.  They determined she had not brought any contraband items with her. Officers gave the CI buy funds and dropped her off near the KFC at about 1:33 PM.  The CI walked the remaining distance to the KFC parking lot under police surveillance.

Two officers conducting surveillance of the KFC parking lot from across the street observed Bitner arrive at the KFC shortly before 1:30 PM, before the CI.  Bitner went into the KFC.  While he was inside, the CI arrived at the KFC parking lot at approximately 1:35 PM and stood at the passenger door of Bitner's car.  Bitner exited the KFC and entered his car on the

driver's side while the CI entered on the passenger side. The CI exited Bitner's car less than a minute later.

After exiting Bitner's car, the CI returned directly to a police van one block away. She produced a bag containing approximately 3.5 grams of a substance later determined by the police to be methamphetamine. Police then conducted a second strip search of the CI. They did not find the money detectives had provided to her earlier to complete the buy.

The State subsequently charged Bitner with delivery of methamphetamine with a sentencing enhancement for committing the offense within 1,000 feet of a school bus stop.

At trial, the State was unable to locate the CI to testify. Bitner moved to exclude the photographs of the CI's text messages regarding the drug purchase based on ER 901 and on his rights under the confrontation clause. As an offer of proof, the State indicated that Withrow would testify that he saw the text message exchange on the CI's phone and took photographs of the exchange. The State also referenced evidence that Bitner was the person that appeared at KFC at approximately 1:30 PM as discussed in the text messages.

The trial court ruled that the photographs of the text messages were authenticated and that Withrow could testify about what he saw and about what the text messages said. However, the court ruled that the State could not produce evidence from the text messages that identified Bitner's name and number. The court also ruled that Withrow could testify only what the text messages said, not that the text messages were from Bitner. Finally, the court ruled that the text messages were not testimonial and therefore did not violate the confrontation clause.

Bitner's first trial ended in a mistrial because the jury panel was tainted during voir dire. Before the second trial, Bitner asked the court to revisit the text message issue but did not assert

a confrontation clause argument at that time. The court maintained its prior rulings regarding admissibility.

At trial, Withrow testified as recited above about reading and photographing the text messages. He testified that the CI sent and received the text messages, but he did not testify that Bitner was the person texting with the CI. The trial court admitted the text message exchange as exhibits over Bitner's objection.

The jury found Bitner guilty of delivery of a controlled substance with a school bus stop sentencing enhancement. Bitner appeals his conviction.

ANALYSIS

A.    AUTHENTICATION OF TEXT MESSAGES

Bitner argues that the trial court erred in admitting the text messages because no witness testifying at trial had the requisite knowledge to authenticate them under ER 901. We disagree.

1.    Legal Principles

Before a trial court admits evidence, ER 901(a) requires that the proponent authenticate it with "evidence sufficient to support a finding that the matter in question is what its proponent claims." *See State v. Bashaw*, 169 Wn.2d 133, 140-41, 234 P.3d 195 (2010). To meet this requirement, the proponent must make a prima facie showing sufficient to allow a reasonable juror to find that the evidence is authentic. *Id.* We review a trial court's admission of evidence for abuse of discretion. *State v. Young*, 192 Wn. App. 850, 854, 369 P.3d 205 (2016).

ER 901(b) provides illustrative examples of authentication. These include testimony by a witness with knowledge, ER 901(b)(1), and "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." ER 901(b)(4). In addition, the methods of authentication for email stated in ER 901(b)(10) are applied by analogy

5

to text messages. *In re Det. of H.N.*, 188 Wn. App. 744, 751-52, 355 P.3d 294 (2015); *see also Young*, 192 Wn. App. at 856. Because authenticity is a preliminary determination, a trial court may consider otherwise inadmissible evidence in determining whether authenticity has been established. *Id.* at 854-55.

In making the authentication determination, the trial court considers only the proponent's evidence in favor of authenticity and disregards any contrary evidence that the opponent submits. *Id.* at 857. Once a prima facie showing of authenticity has been made, the challenged evidence is admissible under ER 901(a) regardless of any contrary evidence offered by the opponent. *Id.* at 855, 857. After that point, contrary evidence goes to the weight, not the admissibility, of the challenged evidence. *Id.* at 857.

2.    Analysis

Here, Withrow testified that he examined the CI's phone, read the text messages, and photographed them. He also testified that the content of the text messages matched what took place on the day the CI met with Bitner. Finally, he confirmed that the photographs offered as exhibits accurately depicted the text messages that were on the CI's phone.

This testimony was sufficient under ER 901(a) to authenticate the exhibits. Withrow was a witness with knowledge of the text messages, which under ER 901(b)(1) is sufficient to authenticate them. And he established that the exhibits were what the State purported them to be – text messages between the CI and a person discussing the sale of drugs.

Bitner argues that the State failed to produce sufficient evidence to authenticate the text messages as involving him as opposed to someone else. Bitner compares his case to *Young*, where this court held that there was sufficient evidence to authenticate that text messages were from the defendant where the recipients of the messages testified that they had come from a

6

phone number the defendant had given them. *Young*, 192 Wn. App. at 856-58. Bitner argues that his case is distinguishable from *Young* because the recipient (here, the CI) did not testify at trial and no evidence linked Bitner with the phone number that sent her the messages.

Bitner also argues that the text messages cannot be authenticated as involving him without the CI's testimony because police also were targeting another suspect using the same CI on the same day. He argues the fact that the CI had messages on her phone consistent with the purchase of drugs establishes only that a purchase took place, not that it involved Bitner himself.

However, establishing that the text message exchange involved Bitner was not required under the facts of this case to authenticate the text messages. The trial court did not allow Withrow to testify that Bitner sent the text messages to the CI and the court ordered that all references to Bitner and the phone number of the texting person be removed. Instead, the admitted exhibits simply contained the text message exchange. Bitner's arguments that the State could not prove that the text messages came from him and that the drug purchase discussed may have involved someone else related to the weight of the evidence, not its admissibility.

In any event, text message evidence can be authenticated based on its contents and substance, "taken in conjunction with the circumstances." ER 901(b)(4), (10); *see H.N.*, 188 Wn. App. at 759 (applying to text messages by analogy the rule for emails stated in ER 901(b)(10)). Here, the context of the text messages and the surrounding circumstances supported the identification of Bitner as the person texting the CI. The text messages arranged for a meeting with the CI at KFC at 1:30 PM, and Bitner appeared at that place and time and met with the CI. The text messages discussed the purchase of a ball of methamphetamine for $100 and the evidence indicated that the CI exchanged that amount of money for that amount of methamphetamine during her meeting with Bitner.

We hold that the trial court did not abuse its discretion in admitting the text messages despite Bitner's authentication challenge.

B.      CONFRONTATION CLAUSE

Bitner argues the trial court's admission of the text messages into evidence violated his right to confront witnesses against him because the CI's texts were testimonial hearsay and he had no ability to confront her at trial. The State responds that admission of the text messages did not implicate the confrontation clause because they were not hearsay. We agree with the State.[1]

1.      Legal Principles

Under the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution, accused persons have the right to confront the witnesses against them. The confrontation clauses in both constitutions provide the same right of defendants to confront witnesses. *State v. Lui*, 179 Wn.2d 457, 467-70, 315 P.3d 493, *cert. denied*, 573 U.S. 933 (2014). As a result, we analyze a defendant's right to confront witnesses under the federal confrontation clause. *Id.* at 470. We review confrontation clause challenges de novo. *State v. Burke*, 6 Wn. App. 2d 950, 964, 431 P.3d 1109 (2018).

The confrontation right applies to witnesses, and a witness is a person who gives testimony. *Lui*, 179 Wn.2d at 480 (citing *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)). Therefore, the confrontation clause generally bars the admission of "testimonial statements" made by a nontestifying witness. *State v. Jasper*, 174 Wn.2d 96, 109, 271 P.3d 876 (2012) (citing *Crawford*, 541 U.S. at 68).

---

[1] Bitner did not specifically raise the confrontation clause issue before the second trial. However, the State does not argue that Bitner did not preserve this issue. Therefore, we do not address whether Bitner was required to raise the confrontation clause issue before the second trial to preserve it.

However, the primary concern of the confrontation clause is *hearsay* that is testimonial. *Crawford*, 541 U.S. at 53; *see also State v. Hudlow*, 182 Wn. App. 266, 282, 331 P.3d 90 (2014) (stating that the admission of "testimonial hearsay" of a witness not appearing at trial violates the confrontation clause). The confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S. Ct. 2078, 85 L. Ed. 2d 425 (1985)). The Court in *Street* stated that a nonhearsay aspect of an out-of-court statement "raises no Confrontation Clause concerns." 471 U.S. at 414.

Following *Street* and *Crawford*, our Supreme Court stated that under the confrontation clause, "even testimonial statements may be admitted if offered for purposes other than to prove the truth of the matter asserted." *State v. Davis*, 154 Wn.2d 291, 301, 111 P.3d 844 (2005), *aff'd*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Washington courts have recognized that "When out-of-court assertions are not introduced to prove the truth of the matter asserted, they are not hearsay and no confrontation clause concerns arise." *State v. Mason*, 127 Wn. App. 554, 566 n.26, 126 P.3d 34(2005); *see also State v. Fraser*, 170 Wn. App. 13, 21, 282 P.3d 152 (2012); *State v. Moses*, 129 Wn. App. 718, 732, 119 P.3d 906 (2005).

2.   Hearsay

The threshold question is whether the CI's text messages were hearsay – offered for the truth of the matter asserted – or not hearsay that does not implicate the confrontation clause. Whether a statement is hearsay is a question of law that we review de novo. *State v. Edwards*,

9

131 Wn. App. 611, 614, 128 P.3d 631 (2006). We hold that the CI's text messages were not hearsay.[2]

"Hearsay" is an out of court statement offered to prove the truth of the matter asserted. ER 801(c). Statements are not hearsay if they are not offered to prove the truth of the matter asserted. *State v. Chambers*, 134 Wn. App. 853, 859, 142 P.3d 668 (2006). Statements are also not hearsay if used only to show the effect on the listener without regard to the truth of the statement. *Edwards*, 131 Wn. App. at 614.

For purposes of the hearsay rule, "[a] 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." ER 801(a). Because an inquiry is not assertive, it is not a "statement" as defined by the hearsay rule and cannot be hearsay. *State v. Collins*, 76 Wn. App. 496, 498, 886 P.2d 243 (1995).

Three of the CI's texts were inquiries: "Will u be in town around 1? And do u got a ball?" and "Would u be able to meet me at kfc?" Ex. 23. These are questions, not assertions. "[T]ell me the price," Ex. 23, also is an inquiry because the CI essentially was asking for the price. These statements were offered to establish the context of the conversation and their effect on the recipient, not to prove the truth of the matter asserted. Accordingly, we conclude that these inquiries were not hearsay statements.

The CI's texts include a few assertions: "Im splitting it with someone," "Yeah I will be just a few I had to pick up the $," "Okay," "Im hurrying," and "Omw." Exs. 23, 24, 25. But the State did not offer these statements to prove the truth of the matter asserted – it did not matter

---

[2] The State notes that the text messages from Bitner to the CI are not hearsay under ER 801(d)(2) because they are statements of a party-opponent.

whether or not they were true.  In fact, the CI's statement that she was splitting the drugs with someone was false.  We conclude that these statements were not hearsay.

The remaining statements simply involved the mechanics of setting up a meeting – "K," "About a half hour," and "1:30ish."  Ex. 25.  Again, they were not offered for their truth.  We conclude that they were not hearsay.

Bitner relies on *Hudlow*, in which Division Three of this court held that statements made during a phone conversation between a CI and the defendant constituted hearsay.  182 Wn. App. at 280-81.  However, that case is distinguishable because the testimony was offered to show that it was the *defendant* who was arranging the drug purchase.  *Id.* at 271-72.  Here, Withrow did not state that Bitner was the person exchanging messages with the CI.

We conclude that the CI's text messages were not offered for their truth and therefore were not hearsay.  Accordingly, we hold that the admission of the text messages into evidence did not implicate Bitner's right of confrontation.

C.      SAG CLAIM – PROSECUTORIAL MISCONDUCT

In his SAG, Bitner asserts that prosecutorial misconduct deprived him of a fair trial because the prosecutor's closing argument improperly (1) bolstered the credibility of law enforcement and (2) incorporated the CI's inadmissible hearsay statements.  We disagree.

To prevail on a claim of prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial.  *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012).  In assessing whether a prosecutor's closing argument was improper, we recognize that the prosecutor has "wide latitude to argue reasonable inferences from the evidence, including evidence respecting the credibility of witnesses."  *State v.*

*Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). To establish prejudice, the defendant must show a substantial likelihood that the misconduct affected the jury verdict. *Id.* at 442-43.

1. Bolstering of Law Enforcement's Credibility

Bitner asserts that the prosecutor improperly bolstered the credibility of law enforcement during his closing argument. Bitner points to the prosecutor's statements to the jury that (1) "I'm not asking you to find the [CI] credible. I'm asking you to find the controlled buy procedures credible," 2 Report of Proceedings (RP) (Oct. 11, 2017) at 255; (2) "So, again, we have the controlled buy procedures. That's what I'm asking you to find credible," 2 RP (Oct. 11, 2017) at 262; and (3) "I'm asking you to find these controlled buy procedures credible." 2 RP (Oct. 11, 2017) at 275.

It is misconduct for a prosecutor to state a personal belief as to the credibility of witnesses. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008). However, the prosecutor here did not state his personal belief as to the credibility of the law enforcement officers who testified to the procedures surrounding the CI's drug purchase in this case. Instead, he told the jury that he was asking them to find that the *procedures* were credible based upon the evidence they heard at trial. This request did not amount to expressing a personal belief on the credibility of law enforcement. Therefore, we hold that these statements were not improper and do not constitute prosecutorial misconduct.[3]

---

[3] Bitner asserts briefly in a footnote that defense counsel's failure to object to the prosecutor's bolstering of law enforcement's credibility in closing argument constituted ineffective assistance of counsel. But because the prosecutor did not improperly vouch for the credibility of the officers, defense counsel was not deficient in failing to object.

2.  Arguing Hearsay Evidence Not Admitted at Trial

Bitner asserts that the prosecutor improperly referenced hearsay statements made by the CI that were not admitted at trial.

As stated above, hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is inadmissible except as provided by the evidence rules, other court rules, or statute. ER 802. A prosecutor's remarks in closing argument constitute misconduct where they suggest to the jury that inadmissible hearsay evidence exists that bolsters the credibility of the State's witnesses. *See State v. Boehning*, 127 Wn. App. 511, 521-23, 111 P.3d 899 (2005).

First, Bitner references the prosecutor's statement, "Had the [CI] been here and had she testified that while in the vehicle the defendant gave her the drugs, that would be direct evidence. She was there. That's something that she's observed happening." 2 RP (Oct. 11, 2017) at 261. The prosecutor made this remark during his closing argument while explaining a jury instruction dealing with the difference between direct evidence and circumstantial evidence. This statement was a hypothetical posed to the jury to illustrate what direct evidence *might have* sounded like in this case. It contained no out-of-court statement actually attributed to the CI. Therefore, we conclude that this statement contained no hearsay and was not improper.

Second, Bitner points to the prosecutor's statement that "it's just as good as having the [CI] come in and saying, 'I got the drugs from the defendant,' because that's the only place she could have gotten them." 2 RP (Oct. 11, 2017) at 263. The prosecutor made this remark in the context of explaining to the jury that circumstantial evidence and direct evidence should be given the same weight, a topic covered by the same jury instruction. The prosecutor was arguing that the circumstantial evidence actually presented at trial was just as strong a basis to conclude that

Bitner had sold drugs to the CI as *hypothetical* testimony from the CI, had she testified at trial, saying, "I got the drugs from the defendant." 2 RP (Oct. 11, 2017) at 262-63. The prosecutor's comment here contained no out-of-court statement actually attributed to the CI. Therefore, we conclude that this statement contained no hearsay and was not improper.

D.      IMPOSITION OF LFOS

Bitner argues that under the 2018 amendments to the LFO statutes, we should strike the DNA collection fee and criminal filing fee imposed on him. The State concedes that the DNA collection fee should be stricken but argues that Bitner has not made the showing that he was indigent as required to strike the criminal filing fee.

In 2018, the legislature amended (1) RCW 43.43.7541, which established that the DNA collection fee no longer is mandatory if the offender's DNA previously had been collected because of a prior conviction; and (2) RCW 36.18.020(2)(h), which now prohibits imposition of the criminal filing fee on a defendant who is indigent as defined in RCW 10.101.010(3)(a)-(c). The Supreme Court in *State v. Ramirez* held that these amendments apply prospectively to cases pending on direct appeal. 191 Wn.2d 732, 749-50, 426 P.3d 714 (2018).

Bitner argues and the State concedes that the DNA collection fee must be stricken because the State has confirmed that his DNA already was collected as the result of a previous conviction. Therefore, we remand for the trial court to strike the DNA collection fee.

Regarding the criminal filing fee, the issue under RCW 36.18.020(2)(h) is whether Bitner was indigent as defined in RCW 10.101.010(3)(a)-(c). Under those subsections, a person is "indigent" if he or she receives certain types of public assistance, is involuntarily committed to a public mental health facility, or receives an annual after tax income of 125 percent or less of the current federally established poverty level. RCW 10.101.010(3)(a)-(c). RCW 36.18.020(2)(h)

14

does not prohibit imposition of the criminal filing fee if the defendant is indigent under only RCW 10.101.010(3)(d), unable to pay the anticipated costs of counsel.

At Bitner's sentencing, the trial court found that he had a limited ability to pay discretionary LFOs and referenced indigency in the judgment and sentence. The court also approved an order of indigency for Bitner to appeal his case at public expense. But the record is unclear if the trial court found Bitner indigent based on the definitions in RCW 10.101.010(3)(a)-(c). Accordingly, we remand for the trial court to determine whether Bitner is indigent under RCW 10.101.010(3)(a)-(c) and therefore whether the criminal filing fee must be stricken.

CONCLUSION

We affirm Bitner's conviction, but we remand for the trial court to strike the DNA collection fee and determine for purposes of imposing the criminal filing fee whether Bitner was indigent under RCW 10.101.010(3)(a)-(c).

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, C.J.

We concur:

_____
MELNICK, J.

_____
SUTTON, J.