FILED
COURT OF APPEALS
DIVISION II

2014 DEC 12 AM 8: 55

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 43870-4-II |
| Respondent, | |
| v. | |
| KISHA LASHAWN FISHER, | PART PUBLISHED OPINION |
| Appellant. | |
| STATE OF WASHINGTON, | (Consolidated with No. 43990-5-II) |
| Respondent, | |
| v. | |
| COREY TROSCLAIR, | |
| Appellant. | |

JOHANSON, C.J. — A jury found Kisha Fisher and Corey Trosclair guilty of first degree murder.[1] Trosclair and Fisher appeal their convictions. In the published portion of the opinion, we hold that Trosclair's rights under the confrontation clause of the Sixth Amendment were

---

[1] RCW 9A.32.030(1)(c).

violated because the redactions in a nontestifying codefendant's statements were insufficient under current confrontation clause jurisprudence. But we hold further that the error was harmless beyond a reasonable doubt. Therefore, although the trial court should have severed Trosclair's case from Fisher's, the court's refusal to do so does not require reversal. In the unpublished portion of the opinion, we address Trosclair's and Fisher's remaining claims and affirm their convictions.

## FACTS

### I. The Shooting Investigation

In January 2011, Lenard Masten received a fatal gunshot wound at an apartment complex in Lakewood. Several apartment residents heard the gunshot. Michelle Davis,[2] Masten's girlfriend, said that Masten had received a telephone call regarding a drug sale. After he left, Michelle[3] heard a loud noise and saw one man standing over Masten while another man ran up the stairs towards Masten's apartment. Nadise Davis described a similar scene. Nadise heard the gunshot, looked out the window, and saw a man standing over Masten cursing loudly and digging through Masten's pockets. Nadise also saw a second man with a gun coming down a stairwell. Aaron Howell heard the gunfire and saw a man in a dark-colored sport utility vehicle leave the area. Howell subsequently identified Trosclair from a photomontage as the man he had seen the night Masten was murdered.

---

[2] Michelle Davis died in an unrelated incident before trial, but made statements to police that the trial court appears to have admitted as excited utterances.

[3] Michelle shares a surname with several family members who testified in this case. We identify members of the Davis family by their first names for clarity, intending no disrespect.

Masten's cell phone records revealed pertinent information. The records showed numerous calls between Mario Steele and Masten on the day Masten was killed, including a three-way phone call between Steele, Masten, and Trosclair three minutes before Masten was shot. Cell phone records also placed Trosclair in the same Lakewood neighborhood as Steele and Masten during the three-way call.

Investigator Jeff Martin interviewed Fisher, Steele's girlfriend and Trosclair's sister, who admitted that she called Masten to set up a drug deal for Steele. Fisher acknowledged that Steele and "two guys" went to purchase cocaine from Masten around 3:00 PM and that they were supposed to meet with Masten again later. 14 Report of Proceedings (RP) at 1610. Fisher also admitted to calling Masten and connecting him on the three-way call with Steele.[4] She initially denied knowing of a robbery plan, but she later admitted that she knew "they talked about [robbing Masten]." 14 RP at 1619.

## II. MOTION TO SEVER

The State charged Fisher and Trosclair each with one count of first degree felony murder and one count of second degree felony murder. Before trial, Fisher and Trosclair moved under CrR 4.4(c)(1) to sever their cases because the State planned to introduce Fisher's interview transcript that referred to Trosclair by name throughout. The State proposed to substitute the phrase "the first guy" in place of Trosclair's name. But Trosclair believed that the use of "the first guy" was an insufficient redaction. The trial court allowed the proposed redactions and denied the motion to sever.

---

[4] The record is somewhat unclear on this point, but it appears that Steele was using Trosclair's phone for this call.

3

### III. Trial

Witnesses testified consistently with the facts as set forth above. In addition, Joseph Adams, who was incarcerated in the Pierce County Jail on an unrelated crime, testified at trial in exchange for a considerable reduction of his own prison term. Coincidentally, Trosclair had been placed in the same jail unit as Adams, who was Masten's close friend.

According to Adams, Trosclair told him that he and Steele planned to rob Masten because they believed Masten had tried to "cheat" them earlier that day by selling them poor quality cocaine. 12 RP at 1338. Trosclair told Adams that someone called Masten to "set up a deal" while Trosclair and Steele waited in the parking lot. 12 RP at 1339. Trosclair explained that they "ran up on [Masten]" as he was getting into his car and that he shot Masten when Masten got "loud" and reached for the gun. 12 RP at 1339. Trosclair then described his attempt to gain access to Masten's apartment and his search of Masten's person "to see what [Masten] had," before running from the scene when someone noticed him. 12 RP at 1339.

Neither Fisher nor Trosclair testified. The jury found Fisher and Trosclair guilty of first degree and second degree murder. The trial court dismissed the second degree murder convictions to circumvent double jeopardy concerns. Fisher and Trosclair appeal.

### ANALYSIS

#### SEVERANCE AND THE CONFRONTATION CLAUSE

Trosclair argues that the trial court should have severed his trial from Fisher's because the redactions to Fisher's interview transcript were insufficient and, therefore, violated Trosclair's Sixth Amendment right to cross-examination. We hold that the redactions were insufficient under

4

*Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), and its progeny. We conclude, however, that any error was harmless.

A. STANDARD OF REVIEW AND RULES OF LAW

We review alleged violations of the state and federal confrontation clauses de novo. *State v. Medina*, 112 Wn. App. 40, 48, 48 P.3d 1005, *review denied*, 147 Wn.2d 1025 (2002). The confrontation clause guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. CONST. amend. VI. A criminal defendant is denied the right of confrontation when a nontestifying codefendant's confession that names the defendant as a participant in the crime is admitted at a joint trial, even where the court instructs the jury to consider the confession only against the codefendant. *Bruton*, 391 U.S. at 135-36. But no violation of the confrontation clause occurs by the admission of a nontestifying codefendant's confession with a proper limiting instruction and where the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence. *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987). Any such redaction must be more than an obvious blank space or other similarly obvious indications of alteration. *Gray v. Maryland*, 523 U.S. 185, 192, 118 S. Ct. 1151, 140 L. Ed. 2d 294 (1998).

To comply with the *Bruton* rule, our Supreme Court adopted CrR 4.4(c), which provides,

> (1) A defendant's motion for severance on the ground that an out-of-court statement of a codefendant referring to him is inadmissible against him shall be granted unless:
> (i) the prosecuting attorney elects not to offer the statement in the case in chief; or
> (ii) deletion of all references to the moving defendant will eliminate any prejudice to him from the admission of the statement.

5

Under this rule, the issue is whether the proposed redactions to a codefendant's statement are sufficient to eliminate any prejudice to the defendant.

## B. ADMISSION OF REDACTED TRANSCRIPT

Trosclair alleges that the transcript contained several statements that allowed the jury to conclude that "first guy" could not have been anyone other than Trosclair. These included Fisher's statements that (1) "first guy" did not have a car, (2) "first guy" lived in Kent, (3) "Mario," the "first guy," and an unknown man from California went to purchase drugs from Masten, (4) Fisher knew that the case was serious because "first guy" and Steele were already in jail as suspects, and (5) a statement that implied that "first guy" was related to Fisher because when she was asked whether a third party was related to "first guy" she answered, "No relation to my family" when the jury had already heard that Fisher and Trosclair were brother and sister. Br. of Appellant (Trosclair) at 23.

In some cases, we have upheld the use of properly redacted statements. For example, in *State v. Cotten*, Bryan Cotten contended that the trial court erroneously allowed witnesses to testify regarding various out-of-court statements made by Cotten's codefendant which implicated Cotten in the crimes. 75 Wn. App. 669, 690, 879 P.2d 971 (1994), *review denied*, 126 Wn.2d 1004 (1995). We disagreed, holding that evidence of statements made by Cotten's nontestifying codefendant were admissible because they did not implicate, name, or even acknowledge the existence of Cotten as an accomplice. *Cotten*, 75 Wn. App. at 691. Similarly, in *Medina*, Division One of this court held that admission of incriminating statements made by a codefendant did not deprive Raul Medina of his right of confrontation when the statements were redacted to refer to the other participants in the crime as "other guys," "the guy," "a guy," "one guy," and "they." 112 Wn.

6

App. at 51. Notwithstanding the fact that only three persons were charged, the testimony established that there were as many as six individuals involved. *Medina*, 112 Wn. App. at 51. The *Medina* court concluded that no *Bruton* violation occurred because the statements were redacted in such a way that it became impossible to track the activities of any particular "guy" among the several involved. 112 Wn. App. at 51. Therefore, the references to "the guys" and "a guy" did not create the inference of identification of Medina or the third codefendant. *Medina*, 112 Wn. App. at 51.

In contrast, we have found violations of the *Bruton* rule when a trial court admitted incriminating statements of a codefendant despite the fact that those statements had been redacted to eliminate the defendant's name. For instance, in *State v. Vannoy*, police officers observed three suspects fleeing the scene of a robbery. 25 Wn. App. 464, 473, 610 P.2d 380 (1980). Following a high-speed pursuit, three men were arrested, including Thomas Vannoy. *Vannoy*, 25 Wn. App. at 473-74. Vannoy's two codefendants both made statements describing the events to law enforcement using a series of "we's" to refer to the group. *Vannoy*, 25 Wn. App. at 473. We reversed Vannoy's conviction when it concluded that a jury, after hearing the redacted confessions and facts of the case, could readily determine that Vannoy was included in the "we's" of the codefendants' statements. *Vannoy*, 25 Wn. App. at 474-75.

And in *State v. Vincent*, the State charged Vidal Vincent with attempted murder and assault stemming from a drive-by shooting. 131 Wn. App. 147, 150, 120 P.3d 120 (2005), *review denied*, 158 Wn.2d 1015 (2006). As he awaited trial, Vincent's codefendant confessed to Jason Speek, another jail inmate, simultaneously incriminating Vincent. *Vincent*, 131 Wn. App. at 150-51. Over Vincent's objection, the trial court allowed the State to introduce the codefendant's

7

statements via Speek's testimony, provided that all references to Vincent were omitted. *Vincent*, 131 Wn. App. at 151. Speek testified that Vincent's codefendant told him that the codefendant and "the other guy" had been involved in an earlier gang fight and that when they returned to the scene, the codefendant shot the victim. *Vincent*, 131 Wn. App. at 155. We held that the admission of Speek's testimony violated Vincent's rights under *Bruton* because there were only two participants in the crime and Speek testified that there was only one "other guy" with the codefendant before, during, and after the shooting. *Vincent*, 131 Wn. App. at 154. Consequently, we concluded that the only reasonable inference the jury could have drawn after hearing Speek's testimony was that Vincent was the "other guy." *Vincent*, 131 Wn. App. at 154.

Here, the State argues that Fisher's statement was sufficiently redacted because she implicated three men as participants in the crime and, therefore, there was more than one possibility regarding "first guy's" identity. We disagree. Although these statements appear facially neutral, the record reveals that the jury could easily infer that "first guy" was Trosclair. Accordingly, this case is analogous to *Vannoy* and *Vincent* and distinguishable from *Cotton* and *Medina*. Even though Fisher implicated as many as three participants in the crimes, one of the three men was Steele, who was named at all times throughout the transcript. The two remaining participants were "first guy" and an unknown man from California. Fisher said that she had never seen the man from California before the day of the crime and had not seen him since.

Meanwhile, Fisher provided several identifying details about "first guy" which revealed her personal knowledge regarding where "first guy" resides, how frequently "first guy" visits Fisher, and whether he owns a car. Significantly, when Fisher was asked whether the man from California was related to the "first guy," she responds, "No relation to my family." 14 RP at 1615.

8

By this point the jury had already heard that Trosclair lived in Kent and that he was Fisher's brother.

Perhaps most egregiously, the State failed to redact Trosclair's first name from a portion of the interview transcript read to the jury. Near the end of the interview, Investigator Sean Conlon asked Fisher a series of questions concerning allegations that Masten prostituted Fisher when the two were dating. When Fisher denied having knowledge of these assertions, Conlon's responsive questioning implied surprise because he had discussed this rumor with both "Corey" and Steele. 14 RP at 1632. This reference to "Corey" was clearly a reference to Corey Trosclair, the defendant. While this exchange did not relate directly to the crime, it explored motive, and it further emphasized the existence of a connection between Steele, Trosclair, and Masten.

As the *Gray* court noted, there are some statements that, despite redactions, "obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately." 523 U.S. at 196. Here, as in *Vincent*, the only reasonable inference the jury could have drawn was that Trosclair was "first guy." Although the trial court provided the necessary limiting instruction, the use of Fisher's redacted statement violated Trosclair's confrontation rights under *Bruton* and its progeny. Accordingly, we hold that the trial court erred in denying Trosclair's motion to sever based on the inadequately redacted statement.

### C. HARMLESS ERROR

A confrontation clause error is subject to the constitutional harmless error test. Such an error is harmless if the evidence is overwhelming and the violation so insignificant by comparison that we are persuaded beyond a reasonable doubt that the violation did not affect the verdict. *Vincent*, 131 Wn. App. at 154-55. Here, the State's untainted evidence of Trosclair's guilt was

9

strong. Cell phone records placed Trosclair with Steele at the scene and in contact with Masten moments prior to the shooting. An eyewitness identified Trosclair as one of the perpetrators from a photomontage. Moreover, Trosclair confessed his guilt to a fellow inmate, providing details that were unknown to anyone other than members of law enforcement. We hold that the violation of Trosclair's confrontation right was harmless beyond a reasonable doubt. Accordingly, we hold that the trial court's denial of Trosclair's motion to sever his trial from Fisher's does not warrant reversal and affirm.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

With regard to Trosclair's additional arguments, we hold that (1) the trial court did not abuse its discretion in refusing to grant Trosclair's motions for mistrial, (2) Trosclair's ineffective assistance of counsel claim fails because Trosclair cannot show that the trial's outcome would have been different, (3) Trosclair's prosecutorial misconduct claim fails because he is unable to show that the misconduct was flagrant and ill intentioned, and (4) the cumulative error doctrine does not require reversal.

## I. DENIAL OF MOTIONS FOR MISTRIAL

Trosclair next contends that the trial court erred when it denied his motion for a mistrial after a police witness testified that he suggested Trosclair could clear himself if he underwent a polygraph examination. Trosclair argues further that the trial court erred by denying two other motions for mistrial related to the State's use of allegedly testimonial statements associated with

10

photomontage identifications in violation of his rights under the confrontation clause of the Sixth Amendment. We disagree.

A. STANDARD OF REVIEW AND RULES OF LAW

We review the grant or denial of a motion for mistrial for an abuse of discretion. *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). A trial court's denial of a motion for mistrial "will be overturned only when there is a 'substantial likelihood' the prejudice affected the jury's verdict." *State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995). And an appellate court finds abuse only "'when no reasonable judge would have reached the same conclusion.'" *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989) (quoting *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 667, 771 P.2d 711, 780 P.2d 260 (1989)). In determining whether the effect of an irregular occurrence at trial affected the trial's outcome, we examine (1) the seriousness of the irregularity, (2) whether it involved cumulative evidence, (3) whether the trial court properly instructed the jury to disregard it, and (4) whether the prejudice was so grievous that nothing short of a new trial could remedy the error. *Hopson*, 113 Wn.2d at 284; *State v. Mak*, 105 Wn.2d 692, 701, 718 P.2d 407, *cert. denied*, 479 U.S. 995 (1986).

B. POLYGRAPH QUESTION

We first determine whether there was an "irregular occurrence" at trial. The general rule in Washington has long been that the "[r]esults of polygraph tests are not recognized in Washington as reliable evidence and are . . . inadmissible without stipulation from both parties." *State v. Thomas*, 150 Wn.2d 821, 860, 83 P.3d 970 (2004) (citing *State v. Renfro*, 96 Wn.2d 902, 905, 639 P.2d 737, *cert. denied*, 459 U.S. 842 (1982)). Nevertheless, "'[t]he mere fact [that] a jury is apprised of a lie detector is not necessarily prejudicial if no inference as to the result is raised or

11

if an inference raised as to the result is not prejudicial.'" *State v. Sutherland*, 94 Wn.2d 527, 529, 617 P.2d 1010 (1980) (quoting *State v. Descoteaux*, 94 Wn.2d 31, 38, 614 P.2d 179 (1980), *overruled by State v. Danforth*, 97 Wn.2d 255, 643 P.2d 882 (1982)).

Here, Martin's reference to a hypothetical polygraph was not improper. During trial, the State questioned Martin about his interview with Trosclair and the following exchange occurred:

> [THE STATE]: Okay. And then at the very end: Did you suggest a lie detector could clear Mr. Trosclair?
> [MARTIN]: Yes.
> [THE STATE]: What was his answer?
> [MARTIN]: No, it won't.

8 RP at 855. Trosclair did not object, but instead moved for a mistrial. Trosclair contended that this reference to the polygraph amounted to a violation of his constitutional right to remain silent. The trial court then denied the motion for mistrial, citing "the way the question was asked" in support of its decision. 8 RP at 880.

The State argues that Trosclair's response to the suggestion that a polygraph could clear him was a reflection of his dishonesty rather than his unwillingness to submit to a lie detector test and, therefore, there was no indication that such a test was offered or refused. Although Trosclair admitted that a lie detector would not "clear" him, he did not refuse to take one nor was one offered. Martin's testimony was not improper testimony regarding unreliable polygraph results. Simply stated, there was no polygraph offered or refused and, therefore, no unreliable polygraph results. Accordingly, the State did not elicit improper polygraph result testimony and there was no "irregularity at trial."

Even if we assume an irregularity occurred at trial, Trosclair's argument still fails when we examine the *Hopson* criteria. First, even if we assume that the introduction of the polygraph

question testimony was irregular and prejudicial, when scrutinized in the context of the entire trial, the seriousness of the irregularity is mitigated. The State did not submit evidence that Trosclair was offered or refused a polygraph test. Thus, any irregularity was not serious. Second, the evidence was cumulative. Evidence showed that Trosclair confessed his crime to Adams. Additionally, cell phone records established Trosclair's presence in Lakewood on the day of the crime. Third, the court did not instruct the jury to disregard the polygraph testimony, but Trosclair did not move to strike the testimony and did not request a limiting instruction.

Finally, while the testimony allowed the jury to draw a prejudicial negative inference, that prejudice was not so grievous that nothing short of a new trial could remedy the error because the untainted evidence against Trosclair was overwhelming. In addition to the phone records that placed Trosclair with Steele at the scene and in contact with Masten moments prior to the shooting, an eyewitness identified Trosclair as one of the perpetrators from a photomontage. Moreover, Trosclair confessed his guilt to a fellow inmate, providing details that were unknown to anyone other than members of law enforcement.

Accordingly, there was not a substantial likelihood that the admission of the polygraph testimony affected the jury's verdict. *Russell*, 125 Wn.2d at 85. The trial court, who is best suited to judge the prejudicial effect of a statement, *State v. Weber*, 99 Wn.2d 158, 166, 659 P.2d 1102 (1983), heard argument and concluded that a mistrial was not required. We conclude that the trial court's denial of the motion for mistrial was not an abuse of its discretion.

## C. PHOTOMONTAGE TESTIMONY

Trosclair also argues that the State violated his right to confrontation when it presented testimonial evidence that allowed the jury to infer that Michelle picked Trosclair out of a

13

photomontage. Trosclair asserts that the trial court erred by denying his motions for mistrials after the introduction of this evidence. We disagree.

A part of a defendant's right to "be confronted with the witnesses against him" in a criminal trial, U.S. Const. amend. VI, the State cannot introduce a testimonial statement from a nontestifying witness unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). A statement is testimonial when its primary purpose is to establish facts relevant to a criminal prosecution. *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). But as we mentioned above, error in admitting evidence in violation of the confrontation clause is subject to a constitutional harmless error test. *Lilly v. Virginia*, 527 U.S. 116, 139-40, 119 S. Ct. 1887, 144 L. Ed. 2d 117 (1999). Error is harmless if the State shows "'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Jasper*, 174 Wn. 2d 96, 117, 271 P.3d 876 (2012) (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)).

During Martin's direct examination, the following occurred:

> [THE STATE]: And please answer yes or no to the next question. The next day did you show Michelle Davis, Ms. [sic] Masten's girlfriend, a photomontage that included Corey Trosclair?
> [MARTIN]: Yes.
> [THE STATE]: Did you then get an arrest warrant for Corey Trosclair?
> [MARTIN]: Yes.

8 RP at 831. Trosclair moved for mistrial shortly after this exchange, claiming that it left the jury with the impression that Michelle picked Trosclair out of the photomontage without an opportunity to cross-examine her. Then during closing argument, the prosecutor said,

14

> It's not a coincidence that Michelle Davis picked these two out of a photomontage, or that Michelle picked Mario Steele out of a photomontage. It's not a coincidence that Aaron Howell picked Corey Trosclair out of the photomontage.

16 RP at 1885. Trosclair again moved for mistrial. The trial court denied both motions.

Trosclair's argument that the trial court erred by denying these motions fails for two reasons. First, no actual statement from Michelle was ever presented. Second, even assuming without deciding that testimonial statements were involved by implication, the introduction of any such evidence in this context was harmless error. Whether or not the testimony left the impression that Michelle identified Trosclair from the photomontage, the jury knew that Howell had done so. The State could have properly substituted Howell's name for Michelle's. Reading the prosecutor's entire argument, it appears that he simply misspoke during closing argument when he suggested that Michelle had picked both Steele and Trosclair from the photomontage and that he quickly corrected his mistake, reminding the jury that it was actually Howell who had identified Trosclair. Thus, any error was harmless and by extension there was not a substantial likelihood that the admission of the photomontage testimony affected the jury's verdict. *Russell*, 125 Wn.2d at 85. Accordingly, the trial court did not abuse its discretion by denying Trosclair's motions.

II. INEFFECTIVE ASSISTANCE OF COUNSEL

Trosclair further asserts that his trial counsel was prejudicially ineffective for failing to move to exclude any reference to the polygraph question at the pretrial stage. Even if we assume, without deciding, that counsel's failure to move to exclude the polygraph evidence was deficient, Trosclair cannot demonstrate that the outcome of the trial would have been different but for counsel's deficient performance.

15

To prevail on an ineffective assistance of counsel claim, Trosclair must show both deficient performance and resulting prejudice; failure to show either prong defeats this claim. *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). To establish prejudice, he must show that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Here, as we discussed above, the State presented strong evidence of Trosclair's guilt (cell phone records, witness identification of Trosclair, Trosclair's own admissions of guilt) such that any prejudicial effect stemming from his trial counsel's failure to preempt the State's use of the polygraph evidence cannot reasonably be said to have affected the outcome of his trial. *Strickland*, 466 U.S. at 694. Consequently, we hold that Trosclair cannot show prejudice and, therefore, he fails to satisfy the second prong of the test. *Strickland*, 466 U.S. at 694.

### III. PROSECUTORIAL MISCONDUCT

We turn next to Trosclair's argument that the prosecutor committed flagrant, prejudicial misconduct in minimizing the State's burden of proof and misstating the role of the jury in two ways. First, the prosecutor misstated the role of the jury in explaining that it could convict the defendant if they "knew" he was guilty. Second, the State again minimized the burden of proof and misstated the jury's role through its use of "Power Point" slides that negated elements of the crime necessary for conviction and implored the jury to "declare the truth." Br. of Appellant (Trosclair) at 47. We conclude that the prosecutor's argument, when considered in context, did not minimize the State's burden and also that the prosecutor's request that the jury "speak the truth," although improper, was not flagrant or ill intentioned. Therefore, Trosclair has waived any error.

16

## A. STANDARD OF REVIEW

To establish prosecutorial misconduct, Trosclair has the burden of establishing that the challenged conduct was both improper and prejudicial. *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). We review the prosecutor's conduct "by examining that conduct in the full trial context, including the evidence presented, 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.'" *State v. Monday*, 171 Wn.2d 667, 675, 257 P.3d 551 (2011) (internal quotations marks omitted) (quoting *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006)).

Because Trosclair failed to object to misconduct at trial, he is deemed to have waived any error unless he establishes that the misconduct was so flagrant and ill intentioned that it caused an enduring prejudice that could not have been cured with an instruction to the jury and the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012); *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). The focus of this inquiry is more on whether the resulting prejudice could have been cured, rather than the flagrant or ill-intentioned nature of the remark. *Emery*, 174 Wn.2d at 762.

## B. ADDITIONAL FACTS

In closing argument, the prosecutor implored the jury to set aside any preexisting notions and feelings it might have about what the reasonable doubt standard is or what it should be because the court had told them what the standard is. Shortly thereafter, the prosecutor said,

> Satisfied, if you have an abiding belief that the defendants committed the robbery, you have a duty to convict them. That's exactly what the instructions tell you. So once you are satisfied -- this is -- put this to you slightly different. At some point you are going to be sitting back in the jury room and somebody is going to

say, I know he did it, but I would like to see more. Well, of course you would like to see more. I know he did it but -- and I want you to stop to think and say, I know he did it, I know he did it. At that point you have an abiding belief in the truth of the charge. You know he did it.

16 RP at 1903-04.

The prosecutor continued, discussing the application of the "reasonable doubt" standard:

It's a doubt that rises from the evidence or lack of evidence. In other words, when you are looking at the truth of the charge, you say it wasn't him. You say, they didn't try to rob Lenard Masten. The gunshot didn't kill him. That's a doubt that arises from the evidence, or the lack of evidence.

Do you have enough? It's not do you wish you had more. Do you have enough? There will always be something else that you would like to see. If you have an abiding belief it just means abiding, long lasting. Are you satisfied -- when you reach your verdict today, are you satisfied tomorrow, are you satisfied two years from now? When you wake up three years from now, I did the right thing. It's not I'm 1,000 percent certain. It's, I know he did it. Are you going to be satisfied two years from now? I know he did it.

16 RP at 1904-05.

## C. ANALYSIS

Trosclair takes issue with the prosecutor's several references to whether the jury "knew" he was guilty in the passages above, arguing that this language minimizes the burden of proof in the jury's mind. But he did not object to this argument at trial. When read in isolation, these statements could appear to minimize the State's burden of proof. But these words could also be read or interpreted as an unnecessary augmentation of the State's burden. The phrase "I *know* he did it" could also be construed as a requirement that a juror be convinced of a defendant's guilt with absolute certainty, which is more than the State is required to prove.

Regardless, these comments are not flagrant and ill intentioned when read in the context of the argument. Immediately before the prosecutor made this argument, he quoted the entire reasonable doubt instruction verbatim. It was only after doing so that he attempted to explain, in

18

lay terms, how an abiding belief is developed. Importantly, the prosecutor here endeavored to connect his argument with the correct legal standard and did not trivialize the State's burden by, for example, comparing the certainty required to convict with the certainty people used when they make everyday decisions. *State v. Walker*, 164 Wn. App. 724, 732, 265 P.3d 191 (2011).

Furthermore, even if Trosclair could demonstrate that this argument was flagrant and ill intentioned, he fails to show that an instruction reminding the jury to consider the evidence only in terms of the reasonable doubt standard could not have cured any prejudice. As mentioned, our focus is directed most strongly towards this consideration. *Emery*, 174 Wn.2d at 762. In *Emery*, the court reasoned that had Emery objected to improper closing arguments at trial, the trial court would have properly explained the jury's role and reiterated the correct burden of proof, eliminating any confusion or prejudice. 174 Wn.2d at 764. The same is true here.

Trosclair also claims that the State misstated the role of the jury with its use of a "Power Point" slide show because the State included slides which implied that the jury did not need to find that the State proved each element of the crime to render a guilty verdict. Trosclair did not object to the slides he now complains of. The State used the following slide in closing argument:

> An Abiding Belief
> If you know Corey Trosclair committed the crime of Robbery or Attempted Robbery, you have an abiding belief and he is guilty of Murder in the First Degree

Ex. 164, at 21. Trosclair argues that this slide and the accompanying statements imply that the jury need only determine whether Trosclair committed robbery to be guilty of first degree felony murder, which is improper because commission of the underlying felony is but one element of the charge. While this is true, it appears from the context of the entire argument that the State framed the slide this way because if the State was able to prove that Trosclair participated in the robbery

that led to Masten's murder, he was guilty of murder because no other element of the crime was in doubt.

In addition to the commission of the robbery, the remaining elements included that (1) the defendant, or another participant, or a person to whom the defendant was acting as an accomplice, caused the death of Masten in the course of or in furtherance of such crime or in immediate flight from such crime, (2) Masten was not a participant in the crime, and (3) any of these acts occurred in the State of Washington. The State did not minimize its burden in the minds of the jury members because these other elements were never in dispute. What was in dispute was whether Trosclair participated in the robbery, the predicate crime to felony murder. Furthermore, two slides later, the State reminded the jury that the defendant is entitled to a fair trial and that the State was required to prove every element of the charge. The slides and the accompanying statements were not improper, but even if they were, it was not flagrant or ill intentioned such that any prejudice could not be cured by an appropriate instruction.

The State also used a slide in which it urged the jury to return verdicts that "speak the truth." 16 RP at 1905. This court and our Supreme Court have consistently held that these arguments are improper. *Emery*, 174 Wn.2d at 760; *State v. Anderson*, 153 Wn. App. 417, 424, 220 P.3d 1273 (2009), *review denied*, 170 Wn.2d 1002 (2010). The *Anderson* court explained,

> A jury's job is not to "solve" a case. It is not, as the State claims, to "declare what happened on the day in question." . . . Rather, the jury's duty is to determine whether the State has proved its allegations against a defendant beyond a reasonable doubt.

153 Wn. App. at 429. The court in *Emery*, agreeing that "declare the truth" statements were improper, carefully analyzed whether these arguments are flagrant or ill intentioned. 174 Wn.2d at 763. The court concluded that such arguments are not the type that our courts have traditionally

found inflammatory—like arguments that appeal to racial biases or local prejudices—so these arguments lacked any possibility of inflammatory effect. *Emery*, 174 Wn.2d at 763. Accordingly, here, the State's demand that the jury "declare the truth," though improper, was not flagrant or ill-intentioned misconduct incurable by an instruction and, therefore, we hold that Trosclair's prosecutorial misconduct claims fail.

## IV. CUMULATIVE ERROR

Finally, Trosclair contends that even if the alleged errors did not compel reversal individually, their cumulative effect should because that effect deprived Trosclair of his state and constitutional rights to a fair trial. Because Trosclair cannot show that he was substantially prejudiced to the extent that he was denied a fair trial considering the totality of the circumstances, we hold that the cumulative error doctrine does not warrant reversal in this instance.

The cumulative error doctrine applies where a combination of trial errors denies the accused a fair trial even where any one of the errors, taken individually, may not justify reversal. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). The defendant bears the burden of proving an accumulation of error of sufficient magnitude that retrial is necessary. *State v. Yarbrough*, 151 Wn. App. 66, 98, 210 P.3d 1029 (2009) (citing *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835, 870 P.2d 964, *cert. denied*, 513 U.S. 849 (1994)). But the doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006), *cert. denied*, 551 U.S. 1137 (2007). Analysis of this issue depends on the nature of the errors because a constitutional error requires reversal unless the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error. *State v. Whelchel*, 115 Wn.2d 708, 728,

801 P.2d 948 (1990). Nonconstitutional error requires reversal only if, within reasonable probabilities, it materially affected the outcome of the trial. *State v. Halstien*, 122 Wn.2d 109, 127, 857 P.2d 270 (1993).

Here, Trosclair's rights under the confrontation clause were violated, but that error was harmless beyond a reasonable doubt and did not affect the outcome of the trial. The State's "speak the truth" statement was improper, but was neither flagrant nor ill intentioned. There was arguably an error associated with the polygraph question. But the untainted evidence against Trosclair was strong and the errors did not deny Trosclair a fair trial. The polygraph testimony did not materially affect the outcome of trial nor would any reasonable jury have reached a different result in the absence of the possible error. In light of all the evidence, we reject Trosclair's argument that the cumulative effect of these errors supports reversal of his conviction. Accordingly, we affirm Trosclair's conviction.

## ANALYSIS – FISHER

Fisher appeals her conviction, arguing that the State presented insufficient evidence to prove that she acted as an accomplice and that the trial court erred when it refused to provide the jury her proposed affirmative defense jury instruction. We hold that there was sufficient evidence to support Fisher's conviction because she aided in the commission of the offense and because she failed to prove by a preponderance of the evidence that she was entitled to the instruction; the trial court did not err in declining to give the requested instruction.

### I. SUFFICIENCY OF THE EVIDENCE

Fisher argues that the evidence was insufficient to prove beyond a reasonable doubt that she acted as an accomplice to felony murder because the fact that she coordinated the final phone

call to Masten, coupled with her reluctance to discuss the case with law enforcement, does not amount to proof beyond a reasonable doubt. Because Fisher coordinated the final phone call to set up the sham drug deal with knowledge that she was assisting in a planned robbery, her claim fails. We hold that sufficient evidence supports Fisher's conviction.

To determine whether evidence is sufficient to sustain a conviction, we review the evidence in the light most favorable to the State. *State v. Wentz*, 149 Wn.2d 342, 347, 68 P.3d 282 (2003). The relevant question is "'whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Drum*, 168 Wn.2d 23, 34-35, 225 P.3d 237 (2010) (quoting *Wentz*, 149 Wn.2d at 347). In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it. *Drum*, 168 Wn.2d at 35 (citing *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). We interpret the evidence "'most strongly against the defendant.'" *State v. Hernandez*, 172 Wn. App. 537, 543, 290 P.3d 1052 (2012) (quoting *State v. Joy*, 121 Wn.2d 333, 339, 851 P.2d 654 (1993)), *review denied*, 177 Wn.2d 1022 (2013). We consider both circumstantial and direct evidence as equally reliable and defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. *Thomas*, 150 Wn.2d at 874-75.

To convict Fisher of first degree murder, the State had to prove the following elements:

> (1) That on or about the 16th day of January, 2011 the defendant or a person to whom the defendant was acting as an accomplice, committed or attempted to commit the crime of Robbery in the First Degree or Robbery in the Second Degree;
> (2) That the defendant, or another participant, or a person to whom the defendant was acting as an accomplice, caused the death of Lenard Masten in the course of or in furtherance of such crime or in immediate flight from such crime;
> (3) That Lenard Masten was not a participant in the crime; and
> (4) That any of these acts occurred in the State of Washington.

23

Consol. Nos. 43870-4-II / 43990-5-II

Clerk's Papers (Fisher) at 172; RCW 9A.32.030(1)(c). A person is guilty of a crime as an accomplice when

> (a) [w]ith knowledge that it will promote or facilitate the commission of the crime, he or she:
> (i) Solicits, commands, encourages, or requests such other person to commit it; or
> (ii) Aids or agrees to aid such other person in planning or committing it.

RCW 9A.08.020(3). "Aid" means all assistance given by words, acts, encouragement, support, or presence. And a person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

Here, Adams testified that Trosclair told him that someone called Masten to set up a drug deal while Trosclair and Steele were waiting outside of Masten's apartment. Fisher admitted to initiating the three-way phone call with Masten moments before his death. Fisher admitted to Conlon first that she knew that Steele and Trosclair had discussed robbing Masten, then that she thought they would likely rob him, and finally that Steele told her they were going to rob Masten. Notwithstanding the fact that Fisher vacillated, backpedaled, and described the events inconsistently, the State presented enough information for a rational fact finder to find the essential elements of felony murder beyond a reasonable doubt. We hold that the State presented sufficient evidence to support Fisher's conviction as an accomplice to first degree murder.

## II. AFFIRMATIVE DEFENSE INSTRUCTION

Fisher also argues that the trial court's refusal to offer one of her proposed jury instructions violated her constitutional right to present a defense and to inform the jury of the applicable law. We hold that the trial court did not err in refusing to give the instruction and, accordingly, we affirm Fisher's conviction.

24

The standard of review for a refusal to give a requested jury instruction depends on whether the refusal was based on a matter of law or fact. *State v. Walker*, 136 Wn.2d 767, 771, 966 P.2d 883 (1998). If the refusal was based on a matter of law, our review is de novo; if it was based on a matter of fact, we review the refusal for an abuse of discretion. *Walker*, 136 Wn.2d at 771-72. Jury instructions are adequate if they permit the parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the applicable law. *State v. Barnes*, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005). And a defendant is entitled to an instruction on his theory of the case if the evidence supports that theory. *State v. Williams*, 132 Wn.2d 248, 259, 937 P.2d 1052 (1997). But a defendant raising an affirmative defense must offer sufficient admissible evidence to justify giving the jury an instruction on the defense. *State v. Janes*, 121 Wn.2d 220, 237, 850 P.2d 495 (1993). In evaluating whether the evidence is sufficient to support such an instruction, the trial court must interpret the evidence most strongly in favor of the defendant. *State v. Mullins*, 128 Wn. App. 633, 639, 116 P.3d 441 (2005) (citing *State v. May*, 100 Wn. App. 478, 482, 997 P.2d 956, *review denied*, 142 Wn.2d 1004 (2000)).

Here, the trial court determined that Fisher was not entitled to the statutory affirmative defense instruction presumably because she did not present sufficient evidence to establish each of the required elements.[5] Therefore, the court's determination was based on a matter of law and, thus, our review is de novo. *Walker*, 136 Wn.2d at 772.

Fisher requested that the court provide the jury with 11 *Washington Practice: Pattern Jury Instructions: Criminal* 19.01, at 291 (3d ed. 2008), which provides,

> It is a defense to a charge of murder in the [first][second] degree based upon [committing][or][attempting to commit](fill in felony) that the defendant:

---

[5] The trial court did not indicate the ground on which it was refusing to provide the instruction.

25

(1)     Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and

(2)     Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and

(3)     Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and

(4)     Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

The defendant has the burden of proving this defense by a preponderance of the evidence. Preponderance of the evidence means that you must be persuaded, considering all the evidence in the case, that it is more probably true than not true. If you find that the defendant has established this defense, it will be your duty to return a verdict of not guilty [as to this charge].

At trial, the State conceded that there was no dispute that Fisher satisfied elements one and two. The State argues, however, that because the burden was on Fisher, she was required to present some evidence to establish the third and fourth elements, which she did not do. Fisher contends that a preponderance of the evidence means that all of the evidence is considered and, therefore, a lack of evidence in the State's case to show she had a reasonable belief that either Steele or Trosclair was armed with a weapon was equally sufficient. We agree with the State that Fisher had the burden to present evidence that she was entitled to the affirmative defense instruction that she requested, and that she failed to do so. Fisher had to present some evidence that she "had no reasonable grounds to believe" that any other participant was armed with such a weapon, instrument, article, or substance, and that she had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

The defendant has the burden of proving this defense by a preponderance of the evidence. Fisher did not testify nor did she call witnesses. Our review of the record reveals no evidence that Fisher had "no reasonable grounds to believe" that another participant was armed and that no other participant intended to engage in conduct likely to result in death or serious physical injury.

26

A relatively low evidentiary burden is a burden nonetheless and no evidence at trial supported a determination that Fisher had no reasonable grounds to believe that other participants were armed and planned to engage in conduct resulting in injury. We hold that the trial court did not err in refusing to give the requested instruction.

Accordingly, we affirm Trosclair's and Fisher's convictions.

JOHANSON, C.J.

We concur:

WORSWICK J.

MELNICK, J.